# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **HEATHERWOOD HOLDINGS, LLC.** | ) | **Case No. 09-00076-TOM11** |
| | ) | |
| Debtor. | ) | |

---

| | | |
|---|---|---|
| **HEATHERWOOD HOLDINGS, LLC.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **A.P. No. 09-00017-TOM** |
| | ) | |
| **FIRST COMMERCIAL BANK,** | ) | |
| **JONATHAN L. KIMERLING,** | ) | |
| **HGC, INC.,** | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This case is before the Court on Heatherwood Holdings, LLC's ("HH") Complaint To Determine The Validity And Extent Of Liens Or Other Interests In Real Estate And To Sell Real Estate Free And Clear Of Liens, Interests And Encumbrances ("Complaint") against First Commercial Bank ("FCB"), Jonathan L. Kimerling, and HGC, Inc. ("HGC") and the counterclaims and cross-claims asserted by HGC. The Court conducted a three-day trial on this matter from February 7, 2011 to February 9, 2011. Appearing during this trial were Mr. Charles Denaburg and Mr. Steven Altmann, counsel for Debtor, Mr. Lee Benton and Mrs. Amy Hazelton, counsel for HGC, and Mr. James Bussian, Mr. Josh Baker, and Mr. Daniel Sparks, counsel for FCB. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a) (1994) and the District Court's General Order Of Reference Dated July 16, 1984, As Amended July 17,

1984.[1]  This is a core proceeding arising under Title 11 of the United States Code as defined in

28 U.S.C. § 157(b)(2)(A) and (K).[2]  This Court has considered the testimony, evidence,

pleadings, arguments of counsel, and the law and finds and concludes as follows.[3]

*Background*

Debtor in this case seeks to sell free and clear of all encumbrances and without any use

restrictions a piece of property in a residential development that has been used exclusively as a

golf course and club[4] since its initial development.  HGC opposes Plaintiff's request to sell free

and clear of all liens and encumbrances and asserts that there is an express restrictive covenant

running with this property, as well as an implied restrictive covenant which restricts the use of

this property to use as a golf course.  HGC further requests an accounting, reversion of the real

estate, and a determination that there is not a valid second mortgage held by Mr. Kimmerling.

---

[1]The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:

The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

[2]28 U.S.C. §157(b)(2)(A) and (K) provide:
(b)(2)Core proceedings include, but are not limited to–

(A) matters concerning the administration of the estate;

****

(K) determinations of the validity, extent, or priority of liens[.]
[3]This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.
[4]As outlined *infra*, the Heatherwood Golf Club is comprised of a golf course, clubhouse, swimming facilities, and tennis courts.

2

Debtor and FCB argue that there are no existing use restrictions on this property.[5]

## FINDINGS OF FACT[6]

*United States Steel's Development And Marketing Of Heatherwood*

Heatherwood is a real estate development in Shelby County, Alabama which consists of residential lots and a golf and country club. United States Steel ("USX") began developing Heatherwood in the mid to late 1970s with the intention of creating a golf course community. To that end, USX designed Heatherwood as a subdivision with residential lots surrounding an eighteen hole golf course. On July 2, 1980, USX recorded plat maps of the first, second, and third sectors of the Heatherwood subdivision in the Shelby County, Alabama Probate Office. These plat maps include numbered lots and, where applicable, references to the golf course. They also include the names of the roads to be developed within those sectors of the development. Each of these roads was named after a golf course or a golf tournament.[7] USX subsequently recorded the first set of general covenants, restrictions, and easements for the Heatherwood subdivision in the Shelby County, Alabama Probate Office on August 26, 1980. This first set of general covenants, restrictions, and easements contains two references to a golf course. Paragraph 2 provides that each residential lot shall have a "golf cart storage area," while paragraph 8 notes that "[n]o fence may be constructed adjacent to the golf course fairways, tees

---

[5]The pleadings included numerous grounds for relief based on multiple theories. However, during the trial the testimony and evidence focused on whether there is an enforceable express or implied restrictive covenant.

[6]Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

[7]For example: "Oakmont Road," "Masters Lane," "Bay Hill Road," and "Turnberry Road."

3

or greens . . . ."

USX began selling residential lots in the Heatherwood subdivision in 1984. In order to provide information about the Heatherwood development to prospective lot purchasers, USX compiled the "Heatherwood Documents," which include the following: 1) "Agreement of Sale - Developer to Purchaser;" 2) "General Information - Heatherwood Golf Club, Inc. ("General Information");" 3) "Membership Information - Heatherwood Golf Club, Inc. ("Membership Information");" 4) "Heatherwood Golf Club Recreation Facilities;" 5) "Heatherwood - General Covenants, Restrictions and Easements;" and 6) "USS Realty Escrow Agreement." The "General Information" document provides that Heatherwood is "a planned residential and golf community" that includes the "recreation facilities described on attached Exhibit '1.'" Exhibit 1 provides that the Heatherwood Golf Club will include "[a]n 18-hole golf course . . . . a club house . . . . tennis courts . . . . [and] [a] swimming pool." The "General Information" document also notes that each homeowner in the Heatherwood subdivision must be a member of the Heatherwood Golf Club. This document further provides that "[i]n the event a homeowner sells his home, the successor must become a member of the Club and will be eligible for the same membership classification as the former homeowner." This requirement is reinforced by the terms of the "Membership Information" document, which provides that

> [a]ny resident member who disposes of his home in Heatherwood subdivision shall give written notice thereof to the Club management and shall automatically cease to be a member at the end of the month in which the disposition occurs. The membership of the homeowner who acquires the residence of a resident member shall become effective on the first day of the month following acquisition subject to fees, dues and charges then in effect.

The "Heatherwood Documents" also note that USX intended to sell the golf club and

4

outlined the three ways by which the eventual sale could occur. The first way the sale could

occur would be if the "Option Members"[8] decided to purchase the golf club facilities for

$1,500,000.00 (*i.e.* the "Option"). This "Option" was set to expire on October 1, 1999. If the

"Option Members" decided not to exercise this "Option," then USX could sell the golf club

facilities to a third-party, or it could sell these facilities to the "Option Members" in "as-is

condition" at the time of the sale for the amount of money that had accumulated in the "Club

Member Escrow Account ("Escrow Account")," "including accumulated interest." According to

the "General Information" document, the "Escrow Account" would be "established [by USX] for

the sole purpose of purchasing the Club facilities in the event USR elects to sell to Club

Members," and would be funded by deposits required of "[s]elected membership classifications."

According to the "USS Realty Escrow Agreement ("Escrow Agreement")," "[p]urchasers of

homes in the subdivision and selected non-residents will be required to pay certain amounts

which are to be held in escrow by USS Realty." Tom Howard, who was previously involved

with USX's development of Heatherwood and is currently employed as General Manager of

USX's Southeastern Real Estate Department, testified during the trial of this matter that USX's

real estate company attempted to provide the "Heatherwood Documents" to all prospective

purchasers.

 USX, through its marketing company, also produced numerous advertisements to attract

prospective lot purchasers. One of these advertisements provides as follows:

> Heatherwood is a playful place. With every homesite comes club
> membership privileges. You can swim, splash, and sun at our pool

---

[8]"Option Members" are defined as "Members who have deposits in the Club Escrow
Account" as of September 30, 1997.

overlooking a lush green valley. Play tennis if that's your game.
Or, we have quieter varieties of fun, too. Enjoy private lakes
enveloped in serenity. Reel in the one that always got away. Share
a picnic or spend a precious moment in contemplation. Breathe in
the priceless, fresh air. Take in a bit of nature while you marvel at
a picture-perfect sunset. All this without leaving your
neighborhood. And of course, there's golf. Imagine returning
home every day to play Heatherwood's 18-hole golf course.

Another advertisement provides, "Imagine: a beautiful home in one of Birmingham's prestigious

areas, surrounded by woods and lakes. Now, imagine that a gorgeous golf course is included."

The Heatherwood Golf Club was substantially completed by 1986. At or near the time

the golf course was completed, USX recorded a second set of General Covenants, Restrictions

and Easements which corresponded to the development of the Fourth Sector of the Heatherwood

development. Among the provisions of this second set of General Covenants, Restrictions and

Easements were the following provisions:

> [H]eatherwood is a planned residential and golf community;
>
> ****
>
> A golf cart storage area must be provided within the areas
> described above. Minimum size 6'-0" wide by 10'0" in length with
> a shelf and electrical outlet (110v) on one of the three walls
> required;
>
> ****
>
> No fence, wall (above the grade of the lot), or hedges may be
> installed in front of a residence or adjacent to the golf course
> fairways, tees, or greens and along the shore line of any lakes;
>
> ****
>
> An easement to permit the doing of every act necessary and proper
> to the playing of golf on the golf course adjacent to the lots which
> are subject to these general covenants, restrictions, and easements

6

is hereby granted and established. These acts shall include, but not be limited to retrieval of golf balls provided such golf balls can be recovered without damaging any flowers, shrubbery or the property in general; the flight of golf balls over and upon such lots; the use of necessary and usual equipment upon such golf course; the usual and common noise level created by the playing of the game of golf; together with all other common and usual activity associated with the game of golf and with all the normal and usual activities associated with the operation of a golf club.

USX subsequently recorded ten other sets of General Covenants, Restrictions and Easements, each of which corresponds to a new sector or phase in the Heatherwood subdivision. Every one of these sets includes the foregoing provisions or substantially similar provisions. Some of them also include the following provision: "The lot owner shall be responsible for the drainage of all surface waters on the lot so as not to increase the natural drainage across neighboring lots or the golf course." Other recorded documents include golf cart path easements granted by Heatherwood homeowners to Heatherwood Golf Club, Inc.[9] for the purpose of permitting golf cart paths on their properties. These easements were to benefit the grantee's land and were intended to be "perpetual and shall run with the land." (Exs. 30-31).

During the trial of this case, Mr. Mike Wesler[10] and Mr. William "Wiggs" Thompson[11] testified about the experiences they had in relation to purchasing real estate lots in the

---

[9]Heatherwood Golf Club, Inc. was formed by USX for the purpose of developing, operating, and maintaining the Heatherwood Golf Club. Heatherwood Golf Club, Inc. is not the same entity as HGC.

[10]Mr. Wesler has been a Heatherwood homeowner and Heatherwood Golf Club member since the 1980s. Additionally, Mr. Wesler has been involved with the Heatherwood Homeowners' Association in various capacities, including president, and he has served as president of HGC since its inception in 1999.

[11]Mr. Thompson was a Heatherwood homeowner from 1998 to 2004, a Heatherwood Golf Club member from1995 to 2004, a member of the Heatherwood Homeowners' Association from 1998 to 1999, and a board member and vice-president of HGC from 1999 to 2000.

7

Heatherwood development.  Mr. Wesler testified that he and his wife began searching for property on which they could build a home in the latter part of 1983.  Specifically, Mr. and Mrs. Wesler were interested in building a home in a residential subdivision in northern Shelby County, Alabama, so he consulted a Birmingham, Alabama metropolitan map.  This map revealed the existence of the Heatherwood residential and golf[12] development in northern Shelby County, Alabama.  After discovering the Heatherwood development, Mr. Wesler decided to drive to the development to investigate the property.  Upon his arrival at the entrance of the development, Mr. Wesler observed a temporary sign[13] which provided that Heatherwood was a USX Realty development that included the Heatherwood Golf Club.  He also noted that Heatherwood had only undergone minor development - "rough cuts;" therefore, it appeared there was property on which he and his wife could build a home.

Mr. Wesler then proceeded to the Heatherwood sales office where he met with a real estate agent to further investigate the development.  Because Heatherwood was substantially undeveloped at this time, Mr. Wesler was forced to rely upon the plat maps, covenants,[14] and marketing materials provided to him by the agent to determine the nature of the development.[15]

---

[12]Mr. Wesler testified that he was interested in a golf course community because he was a recreational golfer.  According to his testimony, Mr. Wesler remains a recreational golfer to this day.

[13]Mr. Wesler testified that this temporary sign was subsequently replaced by a permanent sign which indicated that Heatherwood was home to the Heatherwood Golf Club.

[14]At this time, only the first set of General Covenants, Restrictions and Easements was available for viewing.

[15]On cross-examination, Mr. Wesler testified that he did not go to the Shelby County Courthouse to review the plat maps and covenants which USX recorded in the Shelby County Probate Office prior to the purchaser of either of his lots; instead, Mr. Wesler relied on the maps, covenants, and other documents provided to him by USX. According to Mr. Wesler's testimony, these documents were similar to the plat maps, "Heatherwood Documents," and the marketing materials as outlined above.

8

According to Mr. Wesler, these documents, along with the sign at the entrance, led him to believe that the golf course would be the central focus of the residential development. This was particularly appealing to Mr. Wesler and his wife since they were interested in building a home in a residential golf community.

The Weslers ultimately decided in 1984 to purchase a residential lot in the Heatherwood development because Heatherwood met most, if not all, of their criteria. They built a house on that lot, moved in and lived there for several years. Subsequently, they purchased a second lot in the Heatherwood development in 1988 which they later built on and moved into. Mr. Wesler testified that he signed a document acknowledging that he had read and understood the contents of the "Heatherwood Documents" during both of these transactions. Mr. Wesler also testified that he received a copy of the applicable covenants, restrictions and easements when he purchased both of these lots. Additionally, Mr. Wesler testified that a portion of the purchase price of each of these lots was placed into the "Escrow Account."

Mr. Thompson testified that he purchased his former home in Heatherwood after becoming a member of the Heatherwood Golf Club a few years earlier as a result of a membership drive. According to Mr. Thompson's testimony, the golf course was the main reason he purchased this home in Heatherwood. Like Mr. Wesler, Mr. Thompson was required to make a deposit in the Club Escrow Account when he purchased this home.[16][17] Mr. Thompson subsequently sold his home in 2004. He testified that the reason for the sale of his home was his

---

[16]Mr. Thompson testified that he assumed the escrow obligation of the former owner.
[17]Though Mr. Thompson did not testify that he signed a document indicating that he had read and understood the "Heatherwood Documents" prior to the purchase of his Heatherwood home, the testimony of Tom Howard indicates that Mr. Thompson at the very least likely received the "Heatherwood Documents" from USX.

9

divorce from his former wife; the sale was in no way related to the condition of the golf course.

*USX's Transfer Of Heatherwood Golf Club To HGC*

As outlined in the "General Information" document of the "Heatherwood Documents," USX always intended to sell the Heatherwood Golf Club. On May 12, 1999, the Heatherwood Homeowners Association Steering Committee[18] offered to purchase the Heatherwood Golf Club facilities from USX for the amount in the Club Escrow Account. Mr. Wesler testified that this offer was made because Club Members feared that a sale of the Golf Club to a third party could damage their ability to control upgrades to the course or result in loss of membership. According to Mr. Wesler, the offer was in no way made in response to a fear that the golf course could become anything other than a golf course in the hands of a third party. Mr. Thompson's testimony, however, was different, as he stated that he wanted to acquire the golf course because he was concerned that a third party might develop it into town homes, mobile homes, etc.

On June 8, 1999, counsel for USX sent a letter to counsel for the Heatherwood Homeowners Association Steering Committee which indicated that USX Corp. accepted their offer, subject to certain conditions. The conditions relevant to the present case were outlined as follows:

> 1. The Club facilities will be transferred by USX to a single business entity that is owned by all Club members, regardless of residence status or escrow contribution, who wish to participate in Club ownership. All such members must initially be granted an ownership option interest commensurate with their current rights in the Club facilities at no cost to them, other than some nominal

---

[18]It is not clear whether Mr. Wesler and/or Mr. Thompson were members of this Committee; however, Mr. Wesler testified that he was involved with the Heatherwood Homeowners Association in the late 1990s, and Mr. Thompson testified that he was an officer of the Heatherwood Homeowners Association from 1998 to 1999.

10

capital contribution which may be necessary (i.e. one cent);

4.  The Club facilities (all in as-is, where-is, with all faults and conditions) that will be transferred are as follows:

> •An eighteen (18) hole golf course; specifically <u>excluded</u> would be (i) a tract of land between the ninth green and the tenth tee (current location of the practice putting green) sufficient in size to provide necessary access to Heatherwood Section 7, and (ii) the lake on hole number 18, behind lots 70 and 71, in the Fourth Sector, First Addition.  USX shall lease the tract of land between the ninth green and the tenth tee (current location of the practice putting green) to the transferee entity for $1 per year with a six (6) month notice of termination provision in order for Sector 7 to be developed;

> •The Heatherwood club house, including all furniture and fixtures;

> •The Heatherwood Golf Club grounds, including the existing tennis courts and associated gazebo, swimming pool, and pool house, driving range, and club house/ amenity parking areas;

> •The maintenance building; and

> •All maintenance, amenities, grounds, offices, club and kitchen equipment owned by USX or Heatherwood Golf Club that is stored at Heatherwood and utilized as the Club for Club operations, with the exception of twenty-five (25) 1997 golf carts owned by an affiliate of USX Corporation and leased to Heatherwood Golf Club.

> Specifically excluded from the transfer of the Club facilities are cash, accountants [sic] receivable, accounts payable, pro shop inventory/merchandise, food inventory, leased equipment, and the real property referenced above.

7.  The purchasers of any lots owned by USX in Heatherwood will be offered Club membership with no initiation fee regardless of when such lots are developed or sold; and

Case 09-00076-TOM11   Doc 273   Filed 06/29/11   Entered 06/29/11 13:29:26   Desc
Main Document      Page 11 of 67

8.      Should any sale or transfer of the transferee business entity occur, then (i) USX shall be provided thirty (30) days notice of such transfer, and (ii) the transferee business warrants and agrees that its obligations and duties described above will be transferred or sold in connection with such transaction.

On June 22, 1999, HGC was incorporated[19] for the purpose of purchasing, operating, and maintaining the Heatherwood Golf Club.[20]  According to the testimony of Mr. Wesler, HGC was comprised of residential equity and non-residential equity members of Heatherwood Golf Club.[21]

On October 8, 1999, USX Corp. and Heatherwood Golf Club, Inc. recorded a Special Warranty Deed which transferred ownership of the Heatherwood Golf Club to HGC subject to numerous exceptions.  The first exception to this transfer - Subsection (a) - provides as follows:

USX shall have the right to locate the Easements in its reasonable discretion, and from time to time relocate or redesign the same; provided that the Easements shall not cross tee, green or bunker areas of the land conveyed hereunder, or lie beneath or immediately adjacent to any areas of the land conveyed hereunder where structural improvements shall be located.

---

[19]The "Purpose and Powers" clause of the Articles Of Incorporation of HGC provides as follows:

This Corporation does not contemplate pecuniary gain or profit to the Members thereof, and the specific purposes for which it is formed are to provide for the ownership, operation, maintenance and preservation of the real property commonly known as "Heatherwood Golf Club" (the "Club"), and to promote the health, safety and welfare of the Members and other user[s] of said Club....

[20]The Articles of Incorporation listed the first Board of Directors as follows:  Paul Angel, Steve Johnson, Bart Rice, Mike Wesler, Harry Vickers, William Rivers, and Ida Havelka.
[21]The Articles Of Incorporation Of HGC provide that "[t]his Corporation shall issue no shares of stock of any kind or nature whatsoever.  Each person who is accepted as a Member of the Club (as provided in the By-Laws) shall be a Member of the Corporation. The Members shall enjoy such qualifications, rights and voting rights as may be fixed in the By-Laws of the Corporation."

12

The second exception to this transfer - Subsection (b) - provides that

> All the Easements shall be selected and located by USX in such a manner as to not unreasonably interfere with the operation of the golf course constituting the land herein conveyed, after prior reasonable notice and consultation with Grantee. In addition, USX shall use its commercially reasonable best efforts to locate any such Easements adjacent to and along the existing fairways located on the land herein conveyed so as not to unreasonably cross such fairways; provided, however, USX shall have the right, subject to subsection (d) hereof, to locate such Easements across the existing fairways if any alternate location would be unreasonably burdensome.

Subsection (d) of the Special Warranty Deed provides that "[t]he construction and installation of the Utilities shall be performed in such a manner as to minimize any disruption to the operation of the golf course located upon the land herein conveyed." The Special Warranty Deed also provides that HGC will take ownership of the Heatherwood Golf Club subject to "(a) any existing leases, licenses, agreements, restrictions, easements, rights-of-way, or encroachments."

The Special Warranty Deed does not include a written or express restriction on HGC or any future owner of the property regarding the use, maintenance or development of the golf course property. During the trial of this case, counsel for FCB introduced statutory warranty deeds involving other developments or neighborhoods wherein USX, as the developer, expressly restricted the use of the land being transferred to use as a golf course property. For example, the statutory warranty deed transferring the property that is now known as the Robert Trent Jones Oxmoor Valley Golf Course provides as follows:

> Section 5. Golf Facility Use. The Property shall be used and operated by SunBelt-Birmingham solely as a "Golf Complex" as generally described herein and for no other purpose without the prior written consent of USX, which may be withheld in USX's sole and absolute discretion. This covenant shall constitute a

Case 09-00076-TOM11    Doc 273    Filed 06/29/11    Entered 06/29/11 13:29:26    Desc
Main Document      Page 13 of 67

covenant running with the land and shall be binding upon SunBelt-Birmingham, and its successors and assigns, and shall inure to the benefit of USX, and its successors and assigns; provided, however, that (I) SunBelt-Birmingham and USX, and their respective successors and assigns, may at any time by written agreement executed by each and recorded in the Probate Office of Jefferson County, Alabama, modify, further define, limit, terminate or otherwise amend said covenant or the scope, nature and/or duration of the same, and (ii) in the absence of an express written assignment by USX, a copy of which shall have been delivered to SunBelt-Birmingham in the manner provided for in the SunBelt Agreement, and an original counterpart of which shall have been recorded in the Probate Office of Jefferson County, Alabama, and indexed in the name of USX in the real estate transfer records of said Probate Office, no rights with respect thereto shall vest in any assignee of USX or pass to any grantee or purchaser of any parcel of USX Land.

Similarly, the statutory warranty deed which transferred ownership of the real estate property that is now known as the Robert Trent Jones Ross Bridge Golf Course provides as follows:

3.01(a)    The Golf Course Property shall at all times be used solely for Golf Course Uses and for no other purposes whatsoever without the prior written approval of USS, which approval may be granted or withheld by USS in its sole and absolute discretion. Any and all Utility Lines located on the Golf Course Property must be underground.

(b)    The Golf Course Property shall be developed and improved and at all times continuously operated and maintained *(i)* as an 18-hole, championship, Professional Golf Association tour quality, daily fee public golf course, and *(ii)* as part of Alabama's Robert Trent Jones Golf Trail.

(c)    For so long as RSA is the owner of fee title to all of the Golf Course Property, then the terms and provisions of this Section 3.01(c) shall be applicable. All Improvements to the Golf Course Property must be reasonable and for Golf Course Uses only and shall be considered to be reasonable if such Improvements *(i)* are consistent with and complementary to the architectural design and construction quality contemplated by USS for the remainder of the Development and *(ii)* do not unreasonably interfere with the use,

14

enjoyment or views of or from any other areas of the Development.

 (d)     To the extent RSA is not the owner of fee title to all of the
Golf Course Property, then no Improvements which are visible
from the remainder of the Development shall be constructed,
installed, operated or maintained on any portion of the Golf Course
Property without the prior written consent of USS, which consent
shall not be unreasonably withheld or delayed by USS.

After introducing these warranty deeds, counsel for FCB asked Mr. Howard on direct

examination if the foregoing use restrictions concerned future use and whether USX intended to

control the respective properties after each transfer through these restrictions.  Mr. Howard

responded by testifying that these use restrictions did concern future use of these properties and

that USX intended to control the use of these properties through these use restrictions after

transferring these properties.  Counsel for FCB then asked Mr. Howard if there was any reason

why similar use restrictions were not placed within the Special Warranty Deed to HGC.  Mr.

Howard responded that he was not aware of any such reason.  However, on cross-examination

Mr. Howard testified that the circumstances surrounding the transfers of the Oxmoor Valley and

Ross Bridge golf course properties were significantly different from those surrounding the

transfer of the Heatherwood golf course property to HGC.  He explained that the Oxmoor Valley

and Ross Bridge golf course properties were completely undeveloped when they were

transferred, whereas the Heatherwood golf course was already fully developed.  Additionally,

USX continued to own all of the property surrounding the Oxmoor Valley and Ross Bridge golf

course properties, whereas USX only owned a few remaining lots in the Heatherwood

development at the time of the transfer.  Therefore, USX had far more reason to place these use

restrictions in the deeds conveying the Oxmoor Valley and Ross Bridge golf course properties

Case 09-00076-TOM11    Doc 273    Filed 06/29/11    Entered 06/29/11 13:29:26    Desc
Main Document      Page 15 of 67

since the development of these golf course properties had not yet occurred.

*HGC's Management Of The Heatherwood Golf Club*

HGC owned the Heatherwood Golf Club for roughly nine months from late September 1999 until the beginning of June 2000. Mr. Wesler testified that HGC relied on membership dues and a line of credit in the amount of $500,000.00 obtained from Aliant Bank[22] in order to operate and maintain the Heatherwood Golf Club during this period of time. According to Mr. Wesler's testimony, HGC used $250,000.00 of the line of credit for insurance, $100,000.00 for a survey of the property, and $90,000.00 to pay a firm to manage the golf course. HGC also had to pay start up costs for the Heatherwood Golf Club restaurant. Mr. Wesler testified that the club ultimately lost approximately $83,000.00 during HGC's ownership of the club. Mr. Wesler testified that this loss was a result of hiring the management firm.

Mr. Wesler and Mr. Thompson both testified that the golf course needed significant capital improvements in order to continue as a viable operation. Mr. Thompson testified that he believed capital improvements in the amount of $2,000,000.00 to $3,000,000.00 were necessary to continue the operations of the club. Mr. Thompson further testified that, generally speaking, members of HGC were not willing to contribute their own money for these capital improvements. Consequently, HGC decided to consider engaging the services of a third-party management company who would make these needed capital improvements.

*HGC's Sale Of The Heatherwood Golf Club To Pine Cone Capital, Inc.*

---

[22]On cross examination, Mr. Wesler was asked if HGC disclosed any use restrictions on the golf course property to Aliant Bank prior to obtaining this line of credit. Mr. Wesler responded that he could not recall whether HGC disclosed any use restrictions to Aliant Bank.

HGC solicited proposals for the operation and management of the Heatherwood Golf Club from numerous golf club management companies, including Pine Cone Capital, Inc. ("PCC"). On January 20, 2000, Mr. William A. Ochsenhirt, III, Vice President of PCC, sent a letter to HGC which provided a brief overview of PCC's corporate structure and how PCC had successfully restored Pine Tree County Club, another Birmingham area country club, through a combination of capital improvements, marketing efforts, and experienced management. This letter also outlined the two contract options PCC would consider in relation to Heatherwood Golf Club: 1) a long-term lease of Heatherwood Golf Club; or 2) PCC's purchase of Heatherwood Golf Club. According to Mr. Ochsenhirt, PCC was "not open to a third party management-type contract since [PCC] prefer[s] to provide [its] own capital to ensure that all capital improvements are done correctly."

Prior to the sending of this letter, Mr. Ochsenhirt had visited the Heatherwood Golf Club in 1999. According to his testimony, Mr. Ochsenhirt made this visit because PCC was interested in acquiring, managing, or leasing other Birmingham-area golf clubs. Mr. Ochsenhirt testified that on his visit he did not notice the street names of the roads within the Heatherwood development, nor did he believe that the central focus of the neighborhood was the golf course. However, Mr. Ochsenhirt testified that it was obvious to him that the Heatherwood development was a residential neighborhood surrounding a golf course. He further testified that he noticed the cart paths that crossed over the residential streets and the tunnels that had been dug underneath some of these streets to provide paths for golf carts. Mr. Ochsenhirt testified that nobody from the Heatherwood Golf Club or HGC ever presented any public records associated with the golf course or the lots adjacent thereto during PCC's assessment of the Heatherwood Golf Club;

17

however, Mr. Ochsenhirt testified that he assumed he saw plat maps similar to those presented to potential Heatherwood homeowners as outlined above during his assessment of the Heatherwood Golf Club.

On April 24, 2000, PCC submitted "An Offer To Purchase HEATHERWOOD GOLF CLUB." Among the "*Key Points*" of this offer were the following provisions:

> 2. Payoff of Debt. PCC will pay the lesser of the entire amount outstanding on Heatherwood Golf Club's line of credit owed to Aliant Bank as of the date of closing or $500,000. In addition to assuming this outstanding debt, PCC will begin construction of the capital improvements outlined below in Fall 2000;
>
> 3. Capital Improvements. PCC will complete the following capital improvements:
> - Redesign and rebuild the golf course to make it more playable
> - Redesign and build new bentgrass greens to USGA specifications
> - Install a state-of-the-art, double-row irrigation system
> - Rebuild all of the sand traps
> - Rebuild and level all of the tees
> - Improve the golf practice area
> - Build permanent restrooms on the golf course
>
> Together, we estimate that it will cost approximately $3,000,000[23] to complete these items. Based on there being approximately 166 equity members remaining in the Club today, this is equivalent to you receiving over $18,000 per member in capital improvements;
>
> ****

---

[23]After visiting Heatherwood Golf Club in 1999, Mr. Ochsenhirt engaged the services of John B. Lofoy, a golf course architect, to study the Heatherwood golf course for the purpose of determining what changes would need to be made to the course and the potential cost of these changes. In a letter dated February 16, 1999, Mr. Lofoy noted that he was of the opinion that the needed improvements would cost roughly the same amount as the cost of building an entirely new golf course. Mr. Ochsenhirt testified that, in his opinion, these improvements would cost roughly $2,500,000.00.

18

4. <u>Remain a Golf Course.</u>  PCC guarantees that Heatherwood Golf
Club will continue to be operated as a golf course for at least the
next 25 years;[24]

5. <u>Dues.</u>  Full Senior dues will be $175 per month after the course
reopens.  In addition, monthly dues increases cannot exceed 5%
per year;

****

7. <u>Membership Cap.</u>  The number of members with unlimited golf
course access will not exceed 600;

8. <u>Retain Your Membership.</u>  Every current equity member has the
option to retain their membership by paying $850 AFTER the
course reopens.  However, you do not owe this amount if you
resign your membership for any reason prior to the reopening.

HGC ultimately decided that PCC would be the best fit for Heatherwood Golf Club

because PCC had a good reputation for managing and operating golf courses, was willing to

make the necessary capital improvements to the golf course, and was willing to agree to operate

the golf course property as a golf course for at least 25 years.  Though the golf course property

had appraised in value at $6.1 million in 1999,[25] the board members of HGC believed that PCC's

offer was acceptable due to the significant amount of money PCC was promising to spend on

much needed capital improvements.  On April 26, 2000, HGC's Board of Directors sent a letter

to all equity members of the Heatherwood Golf Club which outlined the terms of PCC's offer to

purchase Heatherwood Golf Club and urged all equity members to seriously consider voting

---

[24]Mr. Ochsenhirt testified that PCC's original proposal did not include a guarantee that
PCC would operate Heatherwood Golf Club as a golf course for the next 25 years.
According to Mr. Ochsenhirt, HGC negotiated for this provision.

[25]Aliant Bank requested that Maloy & Company, Inc. perform an appraisal on this piece
of property during the latter half of 1999 presumably for the purpose of determining
whether or not it should extend the $500,000.00 line of credit it ultimately extended to
HGC.  (Ex. 28).

19

affirmatively for the plan on May 7, 2000.[26]   This letter went on to note that two "parlor meetings" would be held on May 4th and May 6th to address any questions or concerns equity members might have regarding PCC's proposed offer.

According to the testimony of Mr. Wesler and Mr. Thompson, the main concerns of HGC were the continued operation of the golf course property as a golf course and ensuring capital improvements to the course were made.  Mr. Ochsenhirt testified that these concerns were clear to him throughout the negotiations between HGC and PCC.  Mr. Wesler testified that Mr. Ochsenhirt explained during the "parlor" meetings that PCC would operate the Heatherwood Golf Club as a golf course for the proposed 25 year time frame even if the course was operating at a loss.  This would be possible because PCC would have the "deep pockets" of Mr. Jonathan Kimerling, Mr. Ochsenhirt's partner in PCC, supporting the club.  Mr. Ochsenhirt denied ever making this promise during these "parlor meetings."  Mr. Wesler also testified that the 25-year operation was discussed during a May 10, 2000 meeting between board members of HGC and

---

[26]Article IV of the Articles of Incorporation of HGC provides as follows:

> This Corporation shall issue no shares of stock of any kind or nature whatsoever.  Each person who is accepted as a Member of the Club (as provided in the By-Laws) shall be a member of the Corporation.  The Members shall enjoy such qualifications, rights and voting rights as may be fixed in the By-Laws of the Corporation.

The By-Laws referred to were not offered into evidence for the Court's review; however, the language of the April 26, 2000 letter (Ex. 37) suggests that these By-Laws require equity members of Heatherwood Golf Club to accept a proposed purchase of the club through a vote.

20

representatives of PCC, including Mr. Ochsenhirt. According to Mr. Wesler, representatives of both parties agreed that the 25-year operation provision would "run with the land." This comment, along with PCC's proposal to operate the golf course property as a golf course for 25 years, led Mr. Wesler to believe that PCC would operate the golf course property as a golf course for at least 25 years. Mr. Ochsenhirt testified that he did not recall discussing or agreeing that the 25-year operation provision would "run with the land." Mr. Ochsenhirt further testified that HGC never told PCC that the golf course could not be operated as anything other than a golf course after the 25 year term. Mr. Ochsenhirt is clearly knowledgeable regarding management and maintenance of golf courses and has been involved with numerous courses. However, this Court finds that the testimony and recollection of Mr. Wesler is more compelling because this is the only golf course he has been involved in selling, overseeing, managing, etc., and his memory as to the facts of this course are likely to be accurate.

This concern and others were also addressed during subsequent negotiations between the attorney representatives of HGC and PCC. On May 18, 2000, Mr. Bradley Sklar, attorney for PCC, sent an e-mail to Mr. Timothy Davis, attorney for HGC, which provided that PCC would guarantee the $2.5 million in capital improvements through the addition of a negative pledge provision and a reversion provision in the asset purchase agreement. Mr. Sklar, as scrivener, outlined these provisions in an asset purchase agreement dated May 19, 2000 which was attached to this e-mail. The proposed negative pledge provision provided that

> [t]he Buyer agrees to keep the Real Property free and clear of liens
> and encumbrances (except for inchoate liens arising by operation
> of law) from the Closing until such time as the Buyer enters into
> financing relating to performing the capital improvements called
> for in 2(d)(i) and (ii) above. At such time the Buyer is free to

21

encumber the Real Property.[27]

The proposed reversion provision provided as follows:

> The parties agree that in the event that Buyer has not met the requirement set forth in 2(d)(ii) above by the end of the twenty-four months from Closing period, that the Real Property (with any encumbrance) may, at Seller's option (and conditioned on Seller's acceptance of such real property with any encumbrance thereon) revert to Seller.  This right of reversion shall be subordinate to and in no way impact Buyer's right to borrow against the real property.  Seller agrees to execute any documents necessary or required by any Lender to Buyer in connection with this subordination.  The parties further agree that this right of reversion will terminate and be of no further force or effect at the first point in time that Buyer has met the requirement set forth in 2(d)(ii) above.  The termination of the Reversion shall be satisfied by providing actual copies of paid invoices totaling the $2,500,000 to the designated representative of Seller as provided in Notices below.  Once such invoices have been presented, this right to Seller shall terminate and be of no further force or effect.  This right of Reversion shall not be a covenant in the Deed so as not to impair Buyer's ability to borrow against the Real Property.

According to Mr. Sklar, the last sentence of this provision was added at the request of PCC.

Section 2(d)(iii) of the attached asset purchase agreement also provided that "Buyer [PCC] covenants that it will operate the purchased assets as a golf course for the next twenty-five (25) years.  This provision shall be included in the Deed."  According to Mr. Sklar's testimony, this sentence was added at the request of HGC's counsel.  On May 19, 2000, Mr. Davis sent an e-mail to Mr. Sklar which noted, among other things, that the reversion provision needed to be placed in the deed in order to protect the interests of the Heatherwood Golf Club members.  Mr. Sklar responded to Mr. Davis' - HGC's - demand later in the day by sending an e-mail to Mr.

---

[27]According to Mr. Sklar's testimony, the double underlining indicated the addition of language.

22

Davis which provided that PCC wanted the reversion provision to remain a contractual provision not included in the deed. According to Mr. Sklar's testimony, PCC did not want the reversion provision to be placed in the deed because PCC was concerned that this provision might prevent PCC from obtaining the financing necessary to carry out the proposed capital improvements. On the same day, Mr. Sklar sent Mr. Davis a revised asset purchase agreement which addressed, among other things, HGC's concern about the reversion provision through the addition of the following proposed language:

> The parties agree to record a document separate from the deed evidencing this right of reversion. Seller further agrees that it will immediately execute a full release which shall also be recorded upon presentation of [invoices evidencing that PCC has made the required $2,500,000 in capital improvements]. This provision may have to be amended prior to Closing on terms satisfactory to Seller, Buyer and Buyer's construction lender.

Section 2(d)(iii) of this revised asset purchase agreement also provided that "Buyer covenants that it will operate the purchased assets as a golf course for the next twenty-five (25) years. This provision shall be included in the Deed."

On May 22, 2000, Mr. Sklar sent "a clean version of the [asset purchase agreement] with the hope that [HGC and PCC] were headed to a signing." This asset purchase agreement - the eighth version of the agreement - included the additional language in the reversion provision which Mr. Sklar had previously proposed. It also provided that PCC's promise to operate the Heatherwood Golf Club as a golf course for 25 years would be included in the deed. Mr. Sklar sent an identical e-mail to Mr. Davis mere minutes after sending the "clean version of the [asset purchase agreement]." This e-mail, however, included an asset purchase agreement - also the eighth version of the agreement - on which there were several handwritten notes and other

23

handwritten revisions.  Of particular importance was the strikeout of the language of the second sentence of subsection 2(d)(iii):   "This provision [- Buyer covenants that it will operate the purchased assets as a golf course for the next twenty-five (25) years -] shall be included in the Deed."  (Ex. 92)  Additionally, the following handwritten note was made at the bottom of page 8 of the asset purchase agreement: "Buyer agrees that all covenants contained in this Section 2(d) shall be included in the Deed or in a separate written agreement satisfactory to both parties to be recorded simultaneously with closing."  The author of this note then drew an arrow from the note to the end of the phrase "Buyer additionally agrees to the following" found under subsection 2(d) to indicate that the handwritten language of the note was to be inserted at this location.  On direct examination, Mr. Sklar testified that he did not know who made these revisions.

On May 23, 2000, Mr. Davis sent an e-mail to Mr. Sklar which included an asset purchase agreement that had been revised to satisfy requests made by members of the HGC board.  Interestingly, the previously mentioned handwritten note was incorporated into subsection 2(d) of this asset purchase agreement.  Furthermore, the previously mentioned strikeout was formally recognized in this draft of the asset purchase agreement.  On May 24, 2000, Mr. Sklar sent an e-mail to Mr. Davis which included the tenth version of the asset purchase agreement. The body of this e-mail provided in pertinent part as follows: "I think we are coming to the end. We have agreed to most all of your changes.  We have requested that the covenants go in a separate document rather than the deed.  I would not think that this would cause a problem for you."  The asset purchase agreement attached to this e-mail was substantially similar to the version of the asset purchase agreement Mr. Davis sent to Mr. Sklar on May 23; however, the tenth version formally struck out "the Deed or in" language under the previous version of

24

subsection 2(d) - subsection 2(d) previously provided in pertinent part that "Buyer agrees that all covenants contained in this § 2(d) shall be included in the Deed or in a separate written agreement" - and omitted "This provision shall be included in the Deed" from subsection 2(d)(iii). According to Mr. Sklar, these revisions were not made by mistake. Mr. Sklar subsequently sent the "clean version" - the eleventh version - of this asset purchase agreement to Mr. Davis at 4:34 p.m. on May 24, 2000. This asset purchase agreement formally omitted "the Deed or in" language that was previously included under subsection 2(d) and, like the version Mr. Sklar had sent earlier that day, did not include the "This provision shall be included in the Deed" language under subsection 2(d)(iii).

Mr. Davis responded by sending a reply e-mail to Mr. Sklar at 5:02 p.m. on the same day. In this e-mail Mr. Davis noted in pertinent part that "I have now spoken to Mike [Wesler] and Wiggs [Thompson] and, best as I can determine, the only issue appears to be the rights/dues structure/etc. of the social and intermediate equity members . . . . Please consult with Bill [Ochsenhirt] and send us a revised draft with Bill's proposed solution." Mr. Davis did not address the previously mentioned omissions.

HGC and PCC executed the final asset purchase agreement ("Agreement") on May 26, 2000. Section 2(d) of the final version of the Agreement provides in pertinent part as follows:

> (d) <u>Improvements to the Property/Golf Course and Continuous Operation Covenants</u>. As part of this transaction, Buyer additionally agrees to the following (Buyer agrees that all covenants contained in this § 2(d) shall be included in a separate written agreement satisfactory to both parties to be recorded simultaneously with Closing):
>
> ****

25

(ii) Buyer agrees to spend at least $2,500,000 on capital improvements (Golf Course and Non-Golf Course areas) within twenty-four (24) months from the Closing.

(iii) Buyer covenants that it will operate the purchased assets as a golf course for the next twenty-five (25) years.

This Agreement also includes the updated reversion provision as proposed by Mr. Sklar. The terms and provisions of this Agreement further provide that "[t]his Agreement is for the sole benefit of the Seller Stockholders," which are defined as "all current Senior Golf, Senior Intermediate and Senior Social Members of the Club (who had a right to vote) at the time this Agreement is executed."[28]

On the same day Mr. Wesler, pursuant to the closing agreement between USX and HGC, sent a letter to USX notifying USX of the proposed transfer of the golf course property to PCC. USX, in a letter dated June 9, 2000, responded by asserting that, among other things,

> Pine Cone will agree to abide by Section 4 of the Closing Agreement [between HGC and USX] which requires HGC to allow purchaser's [sic] who purchase previously unsold lots within the Heatherwood residential community directly from USX or an affiliate of USX to be entitled to become members of the Club at no cost to such purchasers, unless otherwise mutually acceptable terms are negotiated and agreed to in writing between USX and Pine Cone. Upon such admission, such purchaser shall be entitled to all the rights and benefits of members of the Club and shall be responsible for regular dues and other assessments as may be required by Pine Cone of all of the members of the club. Again, this was a significant condition to the transfer of the club to HGC by USX and it is an obligation which USX is relying upon. USX understands and agrees that this is the only liability or obligation of HGC to USX which Pine Cone will assume. Pine Cone will have

---

[28]The testimony and evidence offered in this case reveals that only a fraction of those who owned residential lots in the Heatherwood development at the time this Agreement was executed would have qualified as "Seller Stockholders" as defined by the final version of the Agreement.

> no other obligations under the Closing Agreement or the
> Indemnification Agreement.

Mr. Wesler, as President of HGC, and Mr. Ochsenhirt, as Vice President of PCC, agreed to and

accepted these and the other terms outlined in this letter.

PCC assigned its rights in the Agreement to Heatherwood Holdings, LLC ("HH") on June

30, 2000. HH was created by PCC for the purpose of owning, operating, and managing the

Heatherwood Golf Club. On July 5, 2000, HGC and Heatherwood Holdings, LLC, entered into

the "side agreement" to the final version of the Agreement. This document generally outlines the

terms and provisions of the final version of the Agreement, including HH's covenant that "it will

operate the purchased assets as a golf course for the twenty-five (25) years from the date of

execution of this Agreement." Further, paragraph 16 of this document provides that

> [t]his Agreement (including the documents referred to herein)
> constitutes the entire agreement between the Parties and supersedes
> any prior understandings, agreements, or representations by or
> between the Parties, written or oral, to the extent they related [sic]
> in any way to the subject matter hereof.

The General Warranty Deed ("Deed") which transferred the golf course property from HGC to

HH was recorded on July 10, 2000. The Deed did not incorporate or in any way refer to the

terms and provisions of the Agreement. The Deed did, however, provide that HH was taking title

to the golf course property "free of all encumbrances," subject to twenty (20) exceptions. The

only exception highlighted by counsel for HGC during the trial of this matter was exception

number 13, which provides that PCC takes title to the golf course property subject to the

> Restrictions or Covenants recorded in Misc. Volume 37, page 537;
> Real 70, page 173 and Instrument 1998-23623, in the Probate
> Office of Shelby County, Alabama, but omitting any covenant or
> restriction based on race, color, religion, sex, handicap, familial

27

status, or national origin.  (Lots 2 & 2A).[29]

HGC and HH also recorded in the Shelby County, Alabama Probate Court the "side agreement" to the Agreement - the separate document referred to in the Agreement.  The side agreement was recorded simultaneously with the Deed.[30]

*HH's Ownership Of The Heatherwood Golf Club*

HH closed the Heatherwood Golf Club for renovations as soon as it acquired the golf course property.  In October 2000, HH entered into a construction agreement with Seaside Golf Development, Inc. to make various capital improvements to the Heatherwood golf course in exchange for payments from HH totaling $1,549,611.00, subject to additions and deductions. HH hired golf course architect Mr. John Lofoy to design these capital improvements and oversee their construction.  Mr. Lofoy's contract required HH to pay him a $200,000.00 fee and up to $20,000.00 of his expenses related to these services.  HH also entered into a construction agreement with D.L. Acton Construction Co., Inc. to make certain renovations to the Heatherwood Golf Club's clubhouse in exchange for payment from HH in the amount of $1,228,051.23.

HH subsequently entered into negotiations with FCB to obtain financing for these improvements and expenses.  Mr. Thomas Genetti testified that he was involved in these

---

[29]This is the first set of General Covenants, Restrictions and Easements recorded by USX. The Court notes that exception number 3 of the Deed - "Restrictions, conditions, easements, rights, mineral and mining rights and rights incident thereto and release of damages as set out in deed from USX to HGC as recorded in Instrument 1999-41994 in the Probate Office of Shelby County, Alabama -, refers to the Special Warranty Deed USX delivered to HGC.

[30]The Deed was recorded on July 10, 2000 at 9:32 a.m. and was assigned instrument number 2000-22842.  The side agreement was recorded on July 10, 2000 at 9:32 a.m. and was assigned instrument number 2000-22843.

28

negotiations during his previous employment as a commercial lender for FCB. He testified that HH approached FCB seeking a loan of $4,000,000.00 to pay for upgrades to the Heatherwood Golf Club. On a visit to the Heatherwood development as a part of his due diligence Mr. Genetti found a residential golf club community which included a golf course surrounded by houses and some undeveloped real estate property. Mr. Genetti also noticed the sign at the front entrance of the development which noted that Heatherwood is a residential golf course community (by now the permanent front entrance sign, Ex. 70, had been placed at the entrance of the Heatherwood subdivision).

On March 14, 2001, Mr. Genetti sent a letter to Mr. Ochsenhirt which outlined the general terms under which FCB would extend loan financing in the amount of $4,000,000.00 to HH. Among these terms were the following requirements: 1) loan would be secured by a first mortgage on the golf course property; 2) loan would be additionally secured by a $500,000.00 certificate of deposit pledged by HH and held by FCB; and 3) Mr. Kimerling would personally guarantee $1,000,000.00 of the loan. Mr. Genetti testified that he was comfortable making this loan based on these provisions and Mr. Ochsenhirt's proven track record of operating Pine Tree Country Club, as well as the $6.1 million appraisal value of the golf course property.[31] Further, Mr. Genetti believed that the property value could be maintained by FCB by redeveloping the golf course property into a residential development in the event HH was unable to successfully rehabilitate the Heatherwood Golf Club. According to Mr. Genetti, this would be the "ultimate backstop" in the event HH defaulted on its loan obligations. Mr. Genetti testified that he

---

[31]Mr. Genetti testified that the $6.1 million appraisal value contemplated all of the proposed upgrades to the golf course property.

29

believed FCB would be able to pursue this "backstop" despite the current use of the property as a golf course because he did not believe this current use equated to a permanent condition. Additionally, Mr. Genetti testified that he believed FCB would be able to pursue this "backstop" because neither HH nor the title check[32] requested by Mr. Genetti revealed any use restriction on the golf course property. He testified that had he been aware of the 25-year golf course use provision found in the Agreement or any other use restriction on the property, implied or express, then he would have required considerably more collateral to secure the loan. Mr. Genetti further testified that he is not familiar with the legal concept of implied restrictive covenants and that he could not recall whether an attorney for FCB ever reviewed the loan documents relevant to this loan transaction at the time of or prior to the loan closing.

HH agreed to the loan financing terms as proposed by FCB and subsequently received financing from FCB. On May 4, 2001, HH executed a promissory note ("Note") in the principal amount of $4,000,000.00, a Mortgage and Security Agreement ("Mortgage") which secured the Note, and an Assignment of Rents and Leases.[33] Also, on May 4, 2001, a Limited Continuing Guaranty Agreement for a maximum amount of $1,000,000.00 was executed by Jonathan L. Kimerling. The Mortgage was recorded in the Shelby County, Alabama Probate Court on May 7,

---

[32]FCB requested a title binder (Ex. 152) from Chicago Title Insurance Company on May 7, 2001.

[33]In a letter dated December 3, 2001, Mr. Genetti requested that the Loan Committee of FCB ratify this loan. Mr. Genetti testified that he did not mention the existence of any use restriction on the golf course property in this letter because neither the title binder nor HH had revealed the existence of the 25-year use restriction located in the Agreement. Had he been aware of any such use restriction, then this restriction would have been noted in this letter. Interestingly, counsel for HGC offered into evidence a title binder (Ex. 153) on the golf course property dated November 17, 2006 which excepted from coverage the terms and conditions of the Agreement dated July 10, 2000.

Case 09-00076-TOM11    Doc 273    Filed 06/29/11    Entered 06/29/11 13:29:26    Desc
Main Document    Page 30 of 67

2001.

The renovations to the Heatherwood Golf Club were completed later that year. Mr. Ochsenhirt testified that these renovations included widened fairways, new bunkers and greens, a new irrigation system, and other aesthetic upgrades. According to Mr. Ochsenhirt, HH spent roughly $4 million on these improvements, nearly $1.5 million more than HH had promised to spend on these improvements. Mr. Thompson testified that he believed HH had spent more than $2.5 million on these capital improvements. He further testified that he had no dissatisfaction whatsoever with these improvements.

HH reopened the Heatherwood Golf Club in October 2001. Pursuant to the terms of the Agreement, the Seller Stockholders of HGC - equity members who continued to pay their monthly dues during the period of time the club was closed for renovations - could continue their memberships in the Heatherwood Golf Club if they paid a one-time fee of $850.00 at this time. Many of these members paid this one-time fee, resulting in a significant one-time spike in the income of the Heatherwood Golf Club. As a result of this spike in income, the Heatherwood Golf Club was able to report net income of $267,240.99 in 2001. This was, however, the only year the Heatherwood Golf Club was profitable under HH, as the club reported net losses of income in 2002 <$383,039.71>, 2003 <$452,727.81>, 2004 <$508,433.18>, 2005 <$484,547.16>, 2006 <$73,525.52>, 2007 <$254,261.99>, and 2008 <$454,645.32>. Mr. Ochsenhirt testified that the Heatherwood Golf Club operated at a net loss during these years because the club was unable to service its debt due to its inability to expand and retain its charter

31

golf memberships, which provided the most income to the club.[34]  According to Mr. Ochsenhirt,

the club's inability to expand and retain these memberships stemmed from "playability issues"

with the golf course that remained even after the significant capital improvements to the course.

Mr. Ochsenhirt explained during the trial of this matter that the most significant "playability

issue" that remained was the narrowness of the fairways.

In January 2005, Mr. Ochsenhirt and Mr. Kimerling acquired the Inverness Country Club,

which is a private country club that is also located in Shelby County, Alabama.  Mr. Wesler

testified that HH's interest in, and maintenance of, the Heatherwood Golf Club began to diminish

after this acquisition.[35]  He further testified that HH transferred some of the nicer furniture of the

Heatherwood Golf Club to the Inverness Country Club in exchange for furniture of lesser quality

and value and that the men's locker room at the Heatherwood Golf Club stopped providing hot

water at some point in time after this acquisition.  According to Mr. Wesler, all of these things

indicated that Mr. Ochsenhirt and Mr. Kimerling were no longer committed to a successful

Heatherwood Golf Club.

Interestingly, Mr. Ochsenhirt testified that he began exploring ideas to change the use of

---

[34]Counsel for FCB offered into evidence a membership information chart created by Mr.
Ochsenhirt which provided membership totals for the Heatherwood Golf Club from 2000
to 2008.  With the exception of 2005, the membership totals for Charter members and
Junior Charter members - the two membership classifications which provided unlimited
access to the golf course - decreased.  In 2001, the total number of Charter members was
230.  That number decreased to 96 by 2008.  In 2001, the total number of Junior members
was 125.  By 2008, that number had decreased to 12.
[35]Counsel for FCB attempted to rebut this testimony by noting that HH
spent $290,628.38 on golf course maintenance during 2008 after spending $289,746.62
on golf course maintenance in 2007; however, the Court notes that HH spent no less than
$402,052.09 on golf course maintenance until 2006, when HH spent $309,577.07 on golf
course maintenance.

the Heatherwood Golf Club in 2005 because it was losing money. During the trial of this case, counsel for HGC offered into evidence a "Loan Review Memo" dated December 12, 2005 that was created by FCB which outlined communications the bank had with HH's management during 2005 regarding a potential alternative use for the golf course property. This letter provides in pertinent part as follows:

> *Management [of HH] is currently seeking a buyer for the Heatherwood Country Club. Heatherwood consists of 139 acres with surrounding real estate owned by USS of 87.5 acres; total real estate equates to 226.5 acres. Management is looking to divide the acreage into 65 lots with a sale price of $60M each, which would provide $3.99MM in equity. The survey is complete and the existing roads would remain in service. Additionally, they are looking to sell the club house for approximately $1MM. Once the sale is complete, the proceeds would go to FCB to pay off the subject debt. The plan to tell the homeowners of the changes is approximately two months before Inverness Country Club re-opens for business [after renovations], which is expected to be in October 2006.*

> *Management purchased Heatherwood from the existing members with the intent to operate as an existing golf club for 25 years. Heatherwood has 19 years remaining in the contract. The intial intent was for Heatherwood to be the flagship. Management for Pine Cone Capital/Pine Tree Country Club and Heatherwood recently had an opportunity to purchase Inverness Country Club. For management to be released from the existing Heatherwood contract and move to Inverness, they are seeking alternative proposal [sic] and incentives for existing Heatherwood membership and Homeowners' Association. Only one-third of the owners are actually members. Therefore, by mid-third quarter 2006, these members will be offered the opportunity to move their existing memberships to Inverness with the $8M membership fee waived and the reduced monthly fees.*

When confronted by HGC's counsel with this memorandum and asked if it was his intention to induce Heatherwood members to leave Heatherwood to benefit the Inverness Country Club, Mr.

33

Ochsenhirt first testified that he was not familiar with this memorandum and that he was not sure where FCB had received the information in that memorandum. Mr. Ochsenhirt then proceeded to testify that he was interested in this particular proposal because Heatherwood was not performing well, but that it was not his intention to help the Inverness Country Club to the detriment of the Heatherwood Golf Club through this proposal. According to Mr. Ochsenhirt, he did not expect members of Heatherwood to leave for Inverness because the fees for membership at Inverness were much higher than those for membership at Heatherwood.

Despite this testimony, the record of this case shows that Mr. Ochsenhirt and HH vigorously pursued HGC's acceptance of this proposal. The record reflects that Mr. Ochsenhirt first contacted Mr. Wesler to discuss this proposal in July 2006. At this time, Mr. Ochsenhirt outlined the Heatherwood Golf Club's financial position and proposed to convert all of the Heatherwood Golf Club equity members into members of the Inverness Country with no initiation fee in exchange for a release from the Agreement. Mr. Wesler contacted counsel for HGC and board members of HGC to review this proposal. Mr. Wesler also requested that HH make its books and records available for HGC's review. According to Mr. Wesler's testimony, this request was not granted.

After meeting to discuss Mr. Ochsenhirt's proposal, the board members of HGC were unanimous in their agreement that the Heatherwood Golf Club should remain open and that HH should not be relieved of their duties and obligations under the Agreement simply because HH was experiencing financial difficulties. According to Mr. Wesler's testimony, the board members of HGC arrived at this conclusion for a number of reasons. First, the board members recalled Mr. Ochsenhirt's promise that Mr. Kimerling would fund the operation of the

34

Heatherwood Golf Club even if it was operating at a loss. Second, the board members believed that HH could continue funding, operating, and managing the Heatherwood Golf Club in view of HH's - Mr. Ochsenhirt's and Mr. Kimerling's - recent purchase of the Inverness Country Club. The board members were further dissuaded from accepting Mr. Ochsenhirt's proposal in view of HH's unwillingness to open their books and records for HGC to review. Without a review of these books and records, HGC could not assess the financial position of the Heatherwood Golf Club. On August 9, 2006, counsel for HGC communicated these views to HH in a letter addressed to counsel for HH. Counsel for HH responded the following day in a letter which provided that HH was "surprised and disappointed" to receive the letter from HGC; however, HH was willing to meet with the board members of HGC to get them "over the hump" with respect to HH's proposal.

HGC and HH, along with the Heatherwood Homeowners' Association, engaged in numerous discussions regarding the future of the Heatherwood Golf Club in the following months. HGC, through the efforts of Mr. Wesler, ultimately encouraged enough people to join the Heatherwood Golf Club during this period of time to convince HH to keep the Heatherwood Golf Club open. The Heatherwood Golf Club remained open for two more years - through the end of 2008. During this period of time, HH continued its marketing efforts to promote the Heatherwood Golf Club. Despite these efforts, no more than 50% of Heatherwood homeowners were members of the Heatherwood Golf Club at any point in time during HH's operation of the club, according to Mr. Ochsenhirt. Consequently, Heatherwood was never able to reach profitability. In a letter dated December 20, 2008, HH told members of the Heatherwood Country Club that it would no longer be able to operate the Heatherwood Country Club due to

35

"some insurmountable obstacles" created by the "recent economic recession." The letter went on to note that HH would cease operating the Heatherwood Country Club on December 31, 2008.

*HH Seeks To Sell Golf Course Property Free And Clear Of All Liens, Interests And Encumbrances*

HH filed for Chapter 11 bankruptcy protection on January 6, 2009. On January 27, 2009, HH filed a Complaint To Determine The Validity And Extent Of Liens Or Other Interests In Real Estate And To Sell Real Estate Free And Clear Of Liens, Interests And Encumbrances ("Complaint") against FCB,[36] Jonathan L. Kimerling,[37] and HGC. HH seeks to sell the golf course property free and clear of all encumbrances, including any use restrictions, express or implied. With respect to HGC, HH acknowledges the existence of a contractual term in the Agreement entered into by HGC and HH which provides that HH will operate the golf course property as a golf course for 25 years. However, HH asserts that it "does not have the funds and is unable to continue the operation of the golf course;" therefore, HH should not be bound by this contractual provision. HGC and numerous Heatherwood homeowners assert that the 25-year use provision in the Agreement amounts to an express restrictive covenant that runs with the land; therefore, a subsequent purchaser of the golf course property will be bound by this use restriction. Additionally, HGC asserts that there is an existing implied restrictive covenant that arose out of USX's initial development and marketing of the Heatherwood subdivision and the recordation of

---

[36]HH's Complaint lists a balance owing on a first real estate mortgage held by FCB in the amount of $2,445,162.34 in this Complaint. A.P. No. 1  FCB's proof of claim, which is dated February 2, 2009, lists a claim in the amount of $2,463,208.33.  Claim 5-1  FCB's Answer to HH's Complaint notes that this balance changes daily based on the "interest accruals and/or payments, if any, made by" HH.  Doc. No. 22.

[37]HH's Complaint lists Mr. Kimerling as the holder of a second real estate mortgage on the golf course property in the amount of $3,337,491.66.

36

various covenants and easements which restricts the use of this property to use as a golf course. In support of this position, HGC cites to an Arizona case - *Shalimar Ass'n v. D.O.C. Enters., Ltd.*, 142 Ariz. 36, 688 P.2d 682 (Ariz. Ct. App. 1984) - which addressed a factual scenario similar in many regards to the facts of the instant case.

In response to these contentions, HH and FCB assert that the express covenant to which HGC refers was merged into the deed and that there was no mutual mistake of fact that could cure this result; therefore, the 25-year provision is not enforceable against HH.

The Court also notes that in its Answer HGC asserts counterclaims against HH and cross-claims against Mr. Kimerling. HGC asserts the following counterclaims against HH: 1) HGC demands an accounting from HH to determine a) whether HH spent $2,500,000.00 on the capital improvements it promised to make in the Agreement and b) whether Mr. Kimerling provided HH adequate consideration for the mortgage he claims to hold on the Heatherwood golf course property; 2) reversion of the golf course property to HGC pursuant to the reversion provision in the Agreement due to HH's failure to spend $2,500,000.00 on promised capital improvements; and 3) because the golf course has reverted to HGC, the property is currently being held by HH in a constructive trust for the benefit of HGC. HGC's cross-claims against Mr. Kimerling are as follows: 1) demand for an accounting to determine whether Mr. Kimerling provided adequate protection to HH for his purported mortgage on the golf course property; and 2) the mortgage given to Mr. Kimerling by HH amounted to a fraudulent transfer to an insider because of a lack of adequate consideration and an intention to defraud HH's creditors.

## CONCLUSIONS OF LAW

I.      *Certification To the Supreme Court Of Alabama*

37

On April 14, 2010, this Court certified three questions to the Supreme Court of Alabama while summary judgment motions were pending. The three questions asked were as follows:

1.      Whether Alabama law recognizes or will imply a restrictive covenant as to a golf course constructed as part of a residential development consistent with an Arizona case with similar facts, *Shalimar Ass'n v. D.O.C. Enters., Ltd.*, 688 P.2d 682 (Ariz. Ct. App. 1984)?;

2.      Whether Alabama law recognizes an implied restrictive covenant that runs with the land when the Deed conveying the property did not contain an express covenant or restriction but a separate Agreement recorded simultaneously with the Deed and recorded immediately thereafter provided that "Buyer covenants that it will operate the purchased assets [the real property] as a golf course for the twenty-five (25) years from the date of execution of this Agreement?";

3.      Whether Alabama law permits the owner of real property to re-sell the property for any use, not limited to the use of a golf course, when the Deed conveying the property did not contain an express covenant or restriction but a separate Agreement recorded simultaneously with the Deed and recorded immediately thereafter provided that "Buyer covenants that it will operate the purchased assets [the real property] as a golf course for the twenty-five (25) years from the date of execution of this Agreement?"

In *Shalimar*, the original developer of a residential subdivision planned to build a golf course in the development with the purpose of inducing prospective purchasers to buy lots in the subdivision and providing a benefit to purchasers of these lots and their successors in interest. To that end, the developer recorded a map with the proposed development in the office of the local county recorder. This map and other marketing materials which depicted or described the

38

golf course were shown to all prospective purchasers. Additionally, salesmen for the developer represented to prospective purchasers of lots that the developer would "develop, maintain, and operate" the golf course property for the benefit of all residential lots within the development. *Shalimar*, 142 Ariz. at 38, 668 P.2d at 684. The original developer also recorded various restrictions on the lots in this development which referred to a golf course property, though no restrictions were recorded against the golf course property. Purchasers of lots within this subdivision relied on these materials when deciding to purchase their respective lots.

Roughly one year later, the original developer opened and began operating the golf course. The original developer of the course was unable to operate the golf course at a profit and subsequently sold the property to a purchaser who desired to develop the so far not profitable golf course property for other uses. The purchaser had seen that the golf course property was surrounded by residential lots and had also seen the recorded plat maps and the various recorded restrictions on the Shalimar residential lots which referenced the golf course property. Furthermore, the purchaser had received a title report which did not insure "against loss by reason of any facts, rights, interests, or claims which are not shown by public record but which could be ascertained by an inspection of the land or by making inquiry of persons in possession thereof." *Id.*, 142 Ariz. at 40, 668 P.2d at 686. The purchaser intentionally did not approach the original developer or current homeowners prior to the purchase.

Based on the foregoing, the Arizona Court of Appeals upheld the trial court's judgment that an implied restrictive covenant had been created to restrict the golf course property to use as a golf course and that the subsequent purchaser had received notice of this restriction; therefore, the implied restrictive covenant was enforceable against this purchaser. The Arizona Court of

39

Appeals further held that the unprofitability of the property as a golf course did not serve to defeat this restriction since the original purpose for the property could still be realized.

FCB and HH contend that this case is factually distinguishable from *Shalimar* in numerous ways and is therefore inapplicable to this case. First, unlike the original developer of the golf course property in *Shalimar*, USX did not promise to maintain the golf course indefinitely. Second, HGC, unlike the homeowners' association in *Shalimar*, actually owned the golf course property and ultimately transferred the property to a subsequent purchaser by way of a Deed which included a warranty on the transferred property but was not subject to an express golf course use restriction. According to HH and FCB, this distinction is critical because HGC, unlike the homeowners' association in *Shalimar*, is now estopped from asserting the existence of an implied restrictive covenant due to the legal effect of the Deed conveying the property to HH. Third, HH argues that unlike the subsequent purchaser in *Shalimar* it did not have notice, actual, constructive, or inquiry, of the implied restrictive covenant; therefore, an implied restrictive covenant, even if one exists in this case, cannot be enforced against HH. Lastly, though the *Shalimar* Court held that an implied restrictive covenant is not defeated where the covenant's original purpose can still be realized even though economic conditions render a business unprofitable, HH, unlike the subsequent purchaser in *Shalimar*, is no longer a solvent entity and therefore does not have the ability to maintain the golf course property as a golf course.

On October 22, 2010, the Supreme Court of Alabama issued an Opinion on these three certified questions in which the Court answered the first question in the affirmative and declined to address the remaining questions. The Alabama Supreme Court held that the facts in *Shalimar* were substantially similar to those undisputed facts surrounding the initial development of the

40

Heatherwood subdivision and that the legal rationale used by the *Shalimar* court was consistent with current Alabama law on restrictive covenants. The Court then proceeded to note that the undisputed evidence surrounding the initial development of the Heatherwood subdivision by USX - the recorded plat map identifying the property at issue as a golf course, although not noting any use restriction, and the recorded restrictive covenants and easements on the residential lots with references to the golf course or golf, along with the continual use of the property as a golf course since 1986 - were evidence of a common scheme of development giving rise to an implied restrictive covenant under Alabama law.[38] The Court further noted that the "Heatherwood Documents" and the various marketing materials provided to prospective purchasers, along with the recorded plat map and recorded covenants and easements, were similar to the documents on which the *Shalimar* Court based its decision. Therefore, like the documents in *Shalimar*, these materials provide "substantial evidence indicating that the original grantor intended a common scheme of development that included the golf-course property as an integral part of that development and as an inducement to purchasers of the residential lots." *Heatherwood Holdings, LLC v. First Commercial Bank, et al.*, 2010 WL 4148531 at *11 (Ala. 2010). However, the Court emphasized that the facts of this case beyond those connected to the initial development of the Heatherwood subdivision may have worked to destroy any implied restrictive covenant. The Court found that issues of notice, estoppel, economic frustration, etc.

---

[38]As will be noted *infra*, the Supreme Court of Alabama opined that these documents, along with the continual use of the property at issue as a golf course, satisfied two of the five methods - three (the filing of a plat showing the restrictions) and four (actual conditions in the applicable subdivision) - of determining whether a common scheme of development exists as outlined in the case of *Hun Es Tu Malade? # 16, LLC v. Tucker*, 963 So. 2d 55, 66 (Ala. 2006).

41

could terminate an implied restrictive covenant in this case, but these issues were left to this

Court to decide.

II.     *Standing Issue Raised by FCB*

FCB questions HGC's standing in this case because HGC no longer owns the golf

course property at issue in this case.  The Court first notes that all of the members of HGC are

members of the Heatherwood Golf Club and some of the members of HGC own residential lots

in the Heatherwood subdivision.  The Court next notes that its Order dated June 5, 2009, which

granted FCB's Motion To Add Indispensable Parties, required HH to add all of the members of

the Heatherwood Golf Club and owners of residential lots in the Heatherwood subdivision who

have an interest in this matter.  Many of these interested persons have remained parties and

continue to be parties to this litigation while others have been dismissed at their request.  The

Court finds that this resolved any concern, dispute or issue about HGC's standing in this case.

III.    *HGCs Implied Restrictive Covenant Claim*

The Supreme Court of Alabama recently outlined the development of the law in Alabama

regarding implied restrictive covenants in the case of *Collins v. Rodgers*, 938 So. 2d 379 (Ala.

2006).[39]  In *Scheuer v. Britt*, the Court quoted with approval the following language from 4

*Thompson on Real Prop.*, § 3398:

> "'Where the owner of a tract of land adopts a general scheme for
> its improvement, dividing it into lots, and conveying these with
> uniform restrictions as to the purposes for which the lands may be

---

[39]In *Collins*, the Supreme Court of Alabama discusses the following cases: *Ex parte Frazer*, 587 So. 2d 330 (Ala. 1991); *Swamson v. Green*, 572 So. 2d 1246 (Ala. 1990); *Hall v. Gulledge*, 274 Ala. 105, 145 So. 2d 794 (1962); *Virgin v. Garrett*, 233 Ala. 34, 169 So. 711 (1936); *Scheuer v. Britt*, 218 Ala. 270, 118 So. 658 (1928); and *Sanborn v. McLean*, 233 Mich. 227, 206 N.W. 496 (1925).

42

used, such restrictions create equitable easements in favor of the owners of the several lots, which may be enforced in equity by any one of such owners. Such restrictions are not for the benefit of the grantor only, but for the benefit of all purchasers. The owner of each lot has as appurtenant to his lot a right in the nature of an easement upon the other lots, which he may enforce in equity.

"'Whether such restriction creates a right which inures to the benefit of purchasers is a question of intention, and to create such right it must appear from the terms of the grant, *or from the surrounding circumstances*, that the grantor intended to create an easement in favor of the purchaser.'"

*Collins*, 938 So. 2d at 389 (quoting *Scheuer*, 218 Ala. 270, 118 So. at 660 (emphasis added)(

quoting 4 *Thompson on Real Prop.*, § 3398)). The *Scheuer* Court then proceeded to note

"[i]n such cases the equitable right to enforce such mutual covenants is rested on the fact that the building scheme forms an inducement to buy, and becomes a part of the consideration. The buyer submits to a burden upon his lot because of the fact that a like burden is imposed on his neighbor's lot, operating to the benefit of both, and carries a mutual burden resting on the seller and the purchasers."

*Id.* at 390 (quoting *Scheuer*, 218 Ala. 270, 118 So. at 660). "This doctrine is neither strange nor

anomalous, as appears from the numerous authorities collected in the note to 21 A.L.R. pages

1300-1326, and finds a striking analogy in the doctrine, often recognized by the court, that where

the owner of land lays it off in lots, blocks, and streets, as a subdivision, and the sale of lots is

made in reference thereto, and purchases are made on the faith of the act, this operates as a

dedication of the street and gives the several lot owners an easement thereon, and this is so

without reference to the statute." *Id.* at 387 (quoting *Scheuer*, 218 Ala. at 273-74, 118 So. at 662

(opinion on rehearing)). On rehearing, the *Scheuer* Court noted that

"[o]n the other hand, it would be strange indeed to hold that one may lay off a subdivision for strictly residential purposes, as a

general scheme of improvement, and sell and convey to numerous
purchasers on the faith thereof, incorporation in their deeds
restrictive covenants as to the use in pursuance of such scheme,
that the promoters of the general scheme could destroy the scheme,
to the detriment of such purchasers, by selling to others without
such restrictions, when they had notice of such general scheme."

*Id.* at 387 (quoting *Scheuer*, 218 Ala. 270, 273-74, 118 So. at 662 (opinion on rehearing)).  In

*Virgin v. Garrett*, the Court noted that

"[t]he question of law which exists in such cases is whether or not
the grantor in the deed containing the restriction agreed expressly
or impliedly that the restriction is for the benefit of the owner of
other property in the subdivision, whether it had been sold or not.
Such a contract may be inferred from the circumstances and terms
of the instrument, and need not be expressed either verbally or in
writing.  The test is said to be the intention of the grantor in
creating the restriction.

*Id.* at 390 (quoting *Virgin*, 233 Ala. 34, 169 So. at 713).  In *Swanson v. Green*, the Court outlined

the five methods of establishing a common scheme of development:

"1) universal written restrictions in all of the deeds of the
subdivision; 2) restrictions in a substantial number of such deeds;
3) the filing of a plat showing the restrictions; 4) actual conditions
in the applicable subdivision; or 5) acceptance of the actual
conditions by the lot owners."

*Id.* at 392 (quoting *Swanson,* 572 So. 2d 1246, 1248 (Ala. 1990)(citing 7 *Thompson on Real*

*Property* § 3163, p. 124 (1962 repl. vol.)).

Though Alabama recognizes the existence of  implied restrictive covenants in certain

scenarios, the Supreme Court of Alabama has cautioned that

the existence of an implied restrictive covenant is not to be inferred
lightly.  This Court has recognized that express restrictive
covenants are disfavored under Alabama law and are to be strictly
construed, with all doubts resolved in favor of the free and
unrestricted use of land and against the covenants.  *See Whaley v.*

44

> *Harrison*, 624 So. 2d 516 (Ala. 1993); *Lange v. Scofield*, 567 So.
> 2d 1299 (Ala. 1990). Logically, if express restrictive covenants are
> disfavored under the law, implied restrictive covenants are to be
> viewed with even less favor.

*Id.* at 385.

As previously noted, the Supreme Court of Alabama held in its Opinion dated October 22, 2010 that the rationale employed by the Arizona Court of Appeals in *Shalimar* is consistent with Alabama law concerning implied restrictive covenants. This Court will therefore consider controlling Alabama law concerning implied restrictive covenants along with the rationale employed by the *Shalimar* Court in determining whether the property at issue in this case is restricted to use as a golf course due to the existence of an implied restrictive covenant.

The record in this case reflects that USX, prior to the sale of the first residential lot in the Heatherwood subdivision, recorded numerous plat maps, one of which was recorded prior to the sale of the first residential lot in the Heatherwood subdivision, which identify the property at issue in this case as a golf course and list the names of the roads in the sectors outlined in these maps, all of which are derived from the names of golf courses and golf tournaments. The record also reflects that the deed to each residential lot in the Heatherwood subdivision is subject to the covenants and easements recorded by USX which contain various references to the property at issue as a golf course as outlined above. In particular, these deeds, through reference to these various covenants and easements, note that Heatherwood is a "planned residential and golf community," require owners of residential lots to construct a golf cart storage area, and prohibit the construction of a fence on those lots which are adjacent to a fairway, tee, or green on the golf course property. In addition to these documents, the record reflects that USX distributed the

45

"Heatherwood Documents," which refer to the Heatherwood development as a "golf course community" and require every homeowner in the subdivision to be a member of the "Heatherwood Golf Club," to many, if not all, prospective lot purchasers. The record further reflects that USX created various marketing materials which highlight the benefits of living in a "golf course community" in an attempt to attract prospective purchasers. USX also erected a sign at the entrance of the development which noted that Heatherwood is a "golf course community." Furthermore, the property at issue has been used exclusively as a golf course since it began operating in 1986.

During the trial of this matter, Mr. Wesler testified that he and his wife were interested in building their first home on a lot in a golf course subdivision. Mr. Wesler testified that they ultimately decided to purchase a lot in the Heatherwood subdivision because they believed, after reviewing some of the previously mentioned documents, that the Heatherwood subdivision would include a golf course. This Court concludes that the Weslers are representative of most, if not all, Heatherwood homeowners and that many other purchasers of lots in the Heatherwood subdivision were similarly induced. The Court also notes that Mr. Tom Howard, who was associated with the development of Heatherwood as an employee of USX, testified that USX always intended for Heatherwood to be a golf course community and that USX never intended for the golf course property to be operated or used as anything other than a golf course. Mr. Howard acknowledged that USX did not intend to own and/or operate the golf course property forever, as evidenced by USX's promise to sell the golf course property. He further acknowledged that USX did not place any express use restrictions on the golf course property similar to the ones USX placed in the deeds conveying the Oxmoor Valley and Ross Bridge golf

46

course properties. However, Mr. Howard testified that USX did anticipate that the golf course property would continue to be used as a golf course by subsequent purchasers of the golf course property as evidenced by agreements between USX and HGC and USX and HH which provide that HGC and HH, respectively, would allow purchasers of lots owned by USX to obtain membership in the Heatherwood Golf Club without an initiation fee. This expectation was also reflected in various provisions of the Special Warranty Deed USX delivered to HGC which refer to the existence of a golf course in the future. He further testified that the conveyances of the Oxmoor Valley and Ross Bridge golf course properties, unlike the conveyance of the Heatherwood golf course property, required express use restrictions because those properties had not been developed into golf courses at the times of those conveyances.

The recorded plat maps and various recorded covenants and easements, along with the continuous use of the property at issue as a golf course since 1986, are evidence of a common scheme of development under methods three (the filing of a plat showing the restrictions), four (actual conditions in the applicable subdivision) and five (acceptance of the actual conditions by the lot owners) as outlined in *Tucker*. Other factors which demonstrate to this Court there was a plan or scheme include: the "Heatherwood Documents" and the various marketing materials created by USX, which are substantially similar to the documents which created an implied restrictive covenant in *Shalimar*; the sign at the entrance of the subdivision specifying that Heatherwood is a residential golf course community; golf-related street names within the subdivision; Mr. Howard's testimony that USX anticipated that the golf course property would continue to be used as a golf course (along with the documents evidencing this anticipation); and Mr. Wesler's testimony that some of the materials outlined above induced him to buy his lots in

the Heatherwood subdivision. All of these facts and factors provide substantial evidence of USX's intent to create a common scheme of development including a residential development centered around a golf course property as an inducement to prospective lot purchasers. Therefore, while this Court is fully aware of the disfavor under Alabama law of property restrictions, the Court finds that USX's initial development and marketing of the Heatherwood subdivision, as well as the sign, street names, easements, plat maps and actual use created an implied restrictive covenant restricting the use of the golf course property to use as a golf course. As noted, the disfavor of restricted use of property should not and will not force any Court to undo what actually occurred in, on and around this parcel of property. It is clear to this Court that hundreds of individuals and couples relied on all of the factors noted when they purchased and moved into this residential golf community. Thus, this Court cannot and will not with the stroke of a pen undo years of conduct, activity, advertisement and reliance.

Having made this determination, the Court must now determine whether subsequent developments in relation to the Heatherwood golf course property have destroyed this implied restrictive covenant. In particular, the Court must determine whether HH had notice of this restrictive covenant, whether the Deed HH received from HGC estops HGC from asserting this restriction, and whether this restriction has been terminated by economic frustration.

*Notice*

HH and FCB argue that HH did not have the requisite notice to be subject to an implied restrictive covenant which restricts the property at issue in this case to use as a golf course. "'In order for an implied restrictive covenant to be enforced against a purchaser, the evidence must show that he had knowledge [actual, constructive, or inquiry] of the restriction at the time he

48

purchased the property.'" *Ex parte Frazer*, 587 So. 2d 330, 332 (Ala. 1991)(citing *Kennedy v. Henley*, 293 Ala. 657, 309 So. 2d 435 (1975)); *see* 5 *Powell on Real Property*, ¶ 673 [2], p. 60-69, n. 142 (1980)("[t]he privity requirement for real covenants is replaced by the notice requirement for equitable restrictions .... The requisite notice can be one of three types: actual, constructive or inquiry notice."); 25 Am. Jur. 2d Easements and Licenses § 93:

> [a] person who purchases land with knowledge or with actual, constructive, or implied notice that it is burdened with an easement in favor of other property ordinarily takes the estate subject to the easement. On the other hand, a bona fide purchaser of land without knowledge or actual or constructive notice of the existence of an easement in such land generally takes title free from the burden of the easement. This rule is broad enough to include all easements, whether created by implication, prescription, or express grant. However, one who purchases land burdened with an open, visible easement is ordinarily charged with notice that he or she is purchasing a servient estate .... In order to charge the purchaser of a servient estate with notice of an unrecorded easement . . . the easement must be one that is apparent as well as necessary and continuous, or the marks of the servitude must be open and visible.

Prior to HH's purchase of the property at issue, Mr. Ochsenhirt visited the Heatherwood Golf Club for the purpose of determining whether PCC should pursue the management and/or ownership of the property. Mr. Ochsenhirt testified that he did not notice the names of the roads within the Heatherwood development during this visit; however, he did notice cart paths that crossed over the residential streets and the tunnels that had been dug under some of these streets for the purpose of accommodating golf carts. Mr. Ochsenhirt also testified that he did not believe the central focus of the neighborhood was the golf course after visiting the Heatherwood development; however, he did testify that it was obvious to him that the Heatherwood development was a residential neighborhood surrounding a golf course. Mr. Ochsenhirt further

49

testified that he assumed he saw plat maps similar to those presented to potential Heatherwood homeowners as outlined above during his assessment of the Heatherwood Golf Club. Whether Mr. Ochsenhirt reviewed recorded documents and/or noticed the entrance sign or street names is not conclusive. He visited the location, and he could have seen the street names and the sign at the entrance. Further, he, like anyone, had every opportunity to review maps and plats which all consistently and repeatedly refer to this property as a golf course.

The foregoing evidence indicates to this Court that it could have and should have been obvious to HH that the golf course property at issue in this case had been developed for the benefit of the surrounding homeowners. Additionally, based on Mr. Ochsenhirt's testimony that he assumed he saw plat maps similar to those presented to potential Heatherwood homeowners prior to HH's purchase of the property at issue, then he was put on notice that USX intended the property at issue to be used as a golf course. The Court finds this is ample evidence that HH had actual as well as constructive and inquiry notice of the implied restrictive covenant restricting the property at issue to use as a golf course.

FCB's representative, Mr. Genetti, saw the property, noticed the sign at the entrance, and he could have and should have noticed the street signs, the golf paths and other highly visible signs of a golf course. He and FCB's counsel could have seen the maps and plats recorded which referenced the "golf course." Finally, despite the fact that FCB's title binder fails to reference the Agreement between HGC and HH including the 25-year golf course operation provision, it was clearly recorded immediately after the Deed as evidenced by the subsequent title binder that reflects this further indication of a restricted use of this property. Therefore, the Court also concludes that FCB had actual, constructive and inquiry notice of this implied restrictive

50

covenant.

*Estoppel*

HH and FCB also assert that the Deed transferring the golf course property from HGC to HH provides that HH takes title to this property "free and clear of all encumbrances," subject only to 20 exceptions which do not refer to an implied restrictive covenant or a set of covenants that could potentially lead to the creation of an implied restrictive covenant; therefore, HGC is estopped from asserting that an implied restrictive covenant restricting the golf course property to use as a golf course is enforceable against HH.

Under Alabama law, the grantor of a deed may not take a position contrary to the terms of the deed subsequent to the conveyance of the deed. *See Clark v. Cypress Shores Dev. Co.*, 516 So. 2d 622, 627 (Ala. 1987)(holding that grantor, who asserted in the deed that restrictions affecting property had been modified, was estopped from subsequently asserting that no modifications had been made to these restrictions). This is the doctrine of estoppel by deed. The Restatement (Third) of Property (Servitudes)[40] § 7.3 (2000) provides that "[a] servitude beneficiary may give a partial release as well as a complete release . . . . [However,] [r]elease by one beneficiary of a servitude cannot affect the interests of the other beneficiaries of the servitude."[41] This rule was recognized in the Alabama case of *McCown v. Gottlieb*, 465 So. 2d

_____

[40]As noted in *Shalimar*, implied restrictive covenants have also been referred to as "equitable servitudes" and "implied equitable servitudes." *Shalimar*, 142 Ariz. at 43, 688 P.2d at 689.

[41]Essentially, HH and FCB assert that the Deed nullifies the effect of all liens and encumbrances on the property at issue in this case - subject to certain exceptions which do not reference or by themselves create the implied restrictive covenant in this case -, which is, in effect, an attempt to release HH from the burdens of these liens and encumbrances.

51

1120 (Ala. 1985). At issue in *McCown* was a restrictive covenant found in the deed to each of the six lots in a residential subdivision which prohibited the owners of each lot in the subdivision from subdividing their lots. The language of this restrictive covenant provided that it "shall run with the land and . . . shall bind the said land as well as the present and all future owners thereof." *McCown*, 465 So. 2d at 1121. The original owner and McCown, a subsequent owner of one of the six lots, executed an "Amendment to Restrictive Covenants" which purported to release the restrictive covenant prohibiting the subdivision of each lot nearly 25 years after the original owner's conveyance of these lots. McCown subsequently conveyed a portion of his lot to individuals who intended to construct another residence on this piece of property. In response, the owners of the other five lots in the subdivision filed suit to enjoin this construction. The Supreme Court of Alabama ultimately held that the restrictive covenant at issue was created for the benefit of each of the six lot owners; therefore, the attempted release of this covenant by less than all of these lot owners failed.

In the present case, HH asserts that HGC transferred the golf course property free and clear of any implied restrictive covenant restricting the use of the golf course property. However, the only way - apart from a lack of notice - the execution and delivery of the Deed in this case could have transferred this property to HH free and clear of the implied restrictive covenant in this case would have been for all of the intended beneficiaries of this covenant to release or in some other fashion terminate their rights to the benefit of this covenant as part of or prior to this transaction. The implied restrictive covenant restricting the golf course property to use as a golf course in this case was created for the benefit of all Heatherwood homeowners; therefore, all

52

Heatherwood homeowners are beneficiaries of this covenant. Though the restrictive covenant at issue in this case is implied as opposed to express, the Court finds that the rule which provides that one servitude beneficiary may not, through a release of her own rights to benefit from the servitude, affect the interests of other servitude beneficiaries is applicable to implied restrictive covenants. Consequently, HGC could not have unilaterally terminated[42] these homeowners' rights through language contained in the Deed to HH. The record in this case reflects that many of the Heatherwood homeowners at this time were not members of HGC. Therefore, HGC, which was comprised of residential and non-residential equity members of the Heatherwood Golf Club, did not represent <u>every</u> Heatherwood homeowner at the time it conveyed title to the golf course property to HH. Thus, unless every Heatherwood homeowner who was not a member of HGC consented to the terms of the Deed from HGC to HH or in some other fashion agreed to the termination of his/her/their right to benefit from the implied restrictive covenant, which is not the case in this matter, then HGC's Deed conveying the property to HH could not have terminated the homeowners' right to benefit from the implied restrictive covenant in this case. The Court finds that since the implied restrictive covenant was intended and actually does benefit hundreds of homeowners, not just HGC and/or its members, the Deed did not, and cannot, by itself, destroy this implied restrictive covenant.

HH's and FCB's estoppel by deed argument fails for another reason. Generally, "the party seeking estoppel must not only lack knowledge regarding true state of title, but be destitute of means of acquiring such knowledge." 31 C.J.S. *Estoppel and Waiver* § 9. This general rule

_____

[42]Clearly HGC never intended any such release, but FCB and HH allege that the Deed from HGC is a release.

Case 09-00076-TOM11    Doc 273    Filed 06/29/11    Entered 06/29/11 13:29:26    Desc
Main Document      Page 53 of 67

finds support in the Alabama case of *Jacksonville Pub. Serv. Corp. v. Calhoun Water Co.*, in which the Alabama Supreme Court noted that the following grounds must appear for an estoppel to affect legal title to land:

> "1. There must be conduct-acts, language, or silence - amounting to a representation or a concealment of material facts. 2. These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him. 3. *The truth concerning these facts must be unknown to the other party claiming the benefit of estoppel, at the time when such conduct was done, and at the time when it was acted upon by him.* 4. The conduct must be done with the intention, or at least expectation, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon. ***5. The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. 6. He must in fact act upon it in such a manner as to change his position for the worse.***"

219 Ala. 616, 123 So. 79 (Ala. 1929)(quoting 2 Pom. Eq. Jur. § 807)(emphasis added).

As already noted, both HH and FCB visited and inspected the Heatherwood neighborhood, community and golf course and reviewed various documents related to the area as outlined above. They had access to plat maps and easements of record. Clearly HH and FCB were not "destitute of means of acquiring such knowledge." Thus, the Court finds that based on the availability of information in open view and for public viewing, the estoppel by deed defense fails as to HH and FCB.

*Integration*

During the trial of this matter, HH and FCB also argued that the doctrine of integration destroys an implied restrictive covenant restricting the golf course property to use as a golf course existed in this case. Specifically, HH and FCB assert that the Agreement between HGC

54

and HH, which does not reference any unwritten or implied agreements or covenants and provides that "[t]his Agreement (including the documents referred to herein) constitutes the entire agreement between the Parties and supersedes an prior understandings, agreements, or representations by or between the Parties, written or oral, to the extent they related in any way to the subject matter hereof," works to destroy this covenant. Alabama law does provide that a covenant will not be implied where the subject matter "is specifically covered by the written terms of the contract." *Ex parte Frazer*, 587 So. 2d 330, 332 (Ala. 1991). However, this argument fails because, as previously noted, HGC did not represent every Heatherwood homeowner at the time HGC and FCB entered into this Agreement; therefore, the implied restrictive covenant could not have been destroyed by this Agreement.

*Frustration Of Purpose Through Changed Circumstances*

HH and FCB lastly argue that any implied restrictive covenant restricting the golf course property to use as a golf course has been terminated due to changed economic circumstances which have rendered the golf course property unsuitable for golf course use. There are two separate tests which the Alabama Supreme Court has used when determining whether changed circumstances render a restrictive covenant unenforceable: 1) the "change of conditions" test; and 2) the "relative hardship" test. *See Miller v. Associated Gulf Land Corp.*, 941 So. 2d 982, 987-89 (Ala. Civ. App. 2005)(citing *Lange v. Scofield*, 567 So. 2d 1299 (Ala. 1990); *Johnson v. H.J. Realty*, 698 So. 2d 781 (Ala. Civ. App. 1997)). The "change of conditions" test requires a showing that "[a] change in character of the neighborhood . . . must have been so great as to clearly neutralize the benefits of the restriction to the point of defeating the object and purpose of

55

the covenant." *Laney v. Early*, 292 Ala. 227, 292 So. 2d 103, 108 (1974). The Heatherwood development was developed as a residential subdivision surrounding a golf course. To this day, Heatherwood remains a residential subdivision surrounding a golf course; therefore, the Court finds that this test is inapplicable to the present case. The "relative hardship" test requires a showing that the enforcement of a covenant "'would harm one landowner without substantially benefitting another landowner.'" *Johnson*, 698 So. 3d at 782 (quoting *Lange*, 567 So. 2d at 1302). In *Lange*, the Supreme Court of Alabama noted that the following factors should be considered when applying this test:

> "'Broadly speaking, the enforcement of building restrictions is governed by equitable principals, and will not be decreed if, under the facts of the particular case, it would be inequitable and unjust . . . . The complainant's right to insist on the restrictive covenant must be clear and satisfactory. . . .

> "'The equitable enforcement of a restriction can be invoked only for the purpose of protecting the benefit which it was the object of the covenant to afford. If the restrictive covenant has ceased to have any beneficial or substantial value to the . . . property, it can form no ground for equitable relief . . . . [I]f the defendant will be subject to great hardship or the consequences would be inequitable, relief will be denied.'"

567 So. 2d at 1302 (quoting *Laney*, 292 Ala. at 233, 292 So. 2d at 109 (quoting 20 Am. Jur. 2d *Covenants, Conditions & Restrictions* § 313, at 876-77)).

The record in this case suggests that neither HGC nor HH, which has significant experience in operating golf courses, has been able to profitably operate the golf course property at issue in this case. Specifically, the record reflects that HGC lost roughly $80,000.00 during its one year operating the golf course property and that HH lost hundreds of thousands of dollars

Case 09-00076-TOM11    Doc 273    Filed 06/29/11    Entered 06/29/11 13:29:26    Desc
Main Document    Page 56 of 67

during its operation of the golf course property despite its efforts. According to Mr. Ochsenhirt, the unprofitability of the golf course property was not a result of poor management; instead, the unprofitability of the golf course stems from the unsuitability of the golf course property for golf course use. Mr. Ochsenhirt testifed that the golf course property is not suitable for continued use as a golf course because, despite significant capital improvements to the property made by HH at the direction of a highly regarded golf course architect, the golf course still has significant "playability issues" which have and will continue to dissuade golfers, who are the lifeblood of the club, from joining the club. Although no evidence or testimony was offered to demonstrate how this course might be profitable, the credible testimony offered by HGC suggests that HH's efforts were diverted to a different course. In addition to the foregoing evidence, the record reflects that HH and FCB have been unable to locate a purchaser for the property that will operate the golf course property as a golf course. However, HH and FCB have been able to attract potential purchasers that would like to develop the golf course property for non-golfing purposes. Based on the foregoing evidence, along with the fact that HH is now in bankruptcy without any assets to operate the golf course property as a golf course, HH asserts that the enforcement of the implied restrictive covenant in this case would amount to an undue burden - "a great hardship" - on HH and FCB.

The Court recognizes that HH and FCB would be burdened by the enforcement of the implied restrictive covenant in this case. However, HH and FCB had every opportunity to know all the facts pertaining to this situation and both voluntarily elected to enter into these transactions. This Court is aware that these two entities might benefit if the use restriction is not

57

enforced because it might be easier to sell the property for any use.

The Court notes that many, if not all, of the owners of residential lots in the Heatherwood subdivision were, as evidenced by Mr. Wesler's and Mr. Thompson's testimony, attracted to the Heatherwood subdivision by the prospect of living in a golf course community. Presumably, then, many, if not all, of these lot owners place a significant value on the existence of a golf course in their neighborhood. This value will be lost if the implied restrictive covenant is not enforced. The Court also notes that the values of these lots will surely diminish by a significant amount if the implied restrictive covenant is not enforced and the property is developed for residential or commercial purposes. Thus, hundreds of homeowners stand to be hurt financially and aesthetically and could be deprived of the peaceful use and enjoyment of their home - usually the biggest investment made by individuals and couples - if this use restriction is not enforced.

The Court believes that in a balancing of the equities in this case the enforcement of the implied restrictive covenant leads to an equitable result. The enforcement of the implied restrictive covenant in this case will not actually place an affirmative duty on HH to comply with its contractual obligation to operate the golf course property as a golf course. The enforcement of this implied restrictive covenant will not force HH to inject any amount of money into the golf course property. Rather, the enforcement of the implied restrictive covenant will simply prohibit HH and FCB from selling the property for any purpose apart from use as a golf course. Additionally, the Court notes that the record in this case indicates that HH appeared to lose interest in operating and maintaining the Heatherwood Golf Club after it acquired the Inverness Country Club in 2005, which may very well have contributed to the unprofitability of the

Heatherwood Golf Club. The record reflects that HH spent substantial money on maintenance from 2001 to 2005 and then began actively seeking a purchaser for the golf course property in 2005. Thereafter, HH spent less on maintenance from 2006 to 2009. Additionally, the record reflects that HH transferred some of Heatherwood Golf Club's furniture to Inverness in exchange for furniture of lesser quality that was previously at the Inverness Country Club. Mr. Ochsenhirt testified that the furniture given to Heatherwood Golf Club was of equal value and quality; however, the Court finds this difficult to believe. It makes no sense to go to the effort of transferring furniture of like value and quality between Heatherwood and Inverness unless the furniture received by each was of some benefit to one or the other. Finally, the testimony that the men's locker room stopped receiving hot water at some point in time after PCC's acquisition of Inverness was not contradicted and supports the testimony offered that the Inverness golf course diverted interest and money from Heatherwood.

With respect to FCB, the Court recognizes that FCB may ultimately be left with a bad investment since HH has filed for bankruptcy protection and there has been little outside interest in purchasing the property for use as a golf course. However, the Court notes that FCB's exposure on its $4,000,000.00 loan appears to be significantly less than that: FCB's proof of claim reflects a balance as of February 2, 2009 of $2,463,208.33. The Court assumes this balance includes credit for a $500,000.00 letter of credit pledged by Mr. Kimerling and collection or payment on the $1,000,000.00 personal guarantee from Mr. Kimerling.

If there is no restriction, every owner of a residential lot in the Heatherwood subdivision would lose the benefit of the existence of the golf course that originally may have induced them

59

to purchase their lots. Presumably every residential lot in Heatherwood may diminish in value if this Court does not enforce the implied restrictive covenant in this case. The Court concludes that in balancing the equities, the owners of residential lots in the Heatherwood subdivision will substantially benefit from the continued existence of the implied restrictive covenant in this case and that the burden HH and FCB may suffer due to the enforcement of this covenant does not outweigh this benefit. Thus, the Court concludes that      HH and FCB have not satisfied the "relative hardship" test.

The Court will also address whether economic factors frustrated the original purpose of the implied restrictive covenant in this case. The Supreme Court of Alabama cited with apparent approval the *Shalimar* Court's treatment of this argument in its Opinion. In *Shalimar*, the subsequent purchaser of a golf course property restricted to use as a golf course by an implied restrictive covenant asserted that the implied restrictive covenant should be terminated by the Court due to the previous unprofitability of the property as a golf course. The Arizona Court of Appeals disagreed with this purchaser, noting that "'[a] mere change in economic conditions rendering it unprofitable to continue the restrictive use is not alone sufficient to justify abrogating the restrictive covenant . . . . if the original purpose of the covenant can still be realized, it will be enforced even though unrestricted use of the property would be more profitable to its owner.'" *Shalimar*, 142 Ariz. at 45, 688 P.2d at 691 (citing *Welshire, Inc. v. Harbison*, 33 Del. Ch. 199, 31 A.2d 404 (1952); *Marra v. Aetna Constr. Co.*, 15 Cal. 2d 375, 101 P.2d 490 (1940)). Finding that the operation of the golf course property by the subsequent purchaser was feasible, the Court held that the original purpose of the implied restrictive covenant could still be realized; therefore,

60

the Court determined that the implied restrictive covenant was not due to be terminated in light of the previous unprofitability of the property as a golf course.

In this case, the Court is aware of the fact that the golf course property, like the golf course property in *Shalimar*, has not been operated profitably as a golf course for most of the last decade and that, according to Mr. Ochsenhirt's testimony, the current economy has made it even more difficult to operate a golf course at a profit. However, the Court believes that the original purpose of the implied restrictive covenant in this case - to provide owners of residential lots in the Heatherwood subdivision the benefit of the existence of a golf course in the subdivision - can still be realized because the golf course property, even if not operated or maintained as a golf course by HH, will still provide one of the benefits Heatherwood homeowners were expecting to receive when they purchased their residential lots in the subdivision, albeit a reduced benefit. Further, predicting the economics of the continued use of a golf course would be speculative at best. Nevertheless, if the implied restrictive covenant is enforced, thus prohibiting any alternative uses, the enforcement of this covenant will allow an opportunity for someone or an entity to operate and maintain this course. The Court finds that the economic circumstances surrounding the development of the golf course property are not sufficient to terminate the implied restrictive covenant in this case.

IV.    *HGC's Express Restrictive Covenant Claim*

HGC also asserts that the following provision of the Agreement between HH and HGC constitutes a covenant that runs with the land: "2(d)(iii). Buyer covenants that it will operate the purchased assets as a golf course for the twenty-five (25) years from the date of

61

execution of this Agreement." In order for a covenant to "run with the land," "it must both (1) have been intended by the parties creating it to run with the land and (2) touch and concern the land." *Miller v. Associated Gulf Corp.*, 941 So. 2d 982, 985 (Ala. Civ. App. 2005). The testimony in this case is contradictory. Mr. Wesler testified that board members of HGC and members of PCC agreed during the "parlor meetings" held prior to the conveyance of the golf course property to HH that this provision would "run with the land." Mr. Ochsenhirt testified that he never made any such agreement.

While this Court finds Mr. Wesler's recollection compelling, the Court notes that the plain language of this provision indicates that "Buyer," defined as "Pine Cone Capital, Inc.," not any successor, assignee, or subsequent purchaser of the golf course property, will operate the golf course property as a golf course for twenty-five years. The Court also notes that the "Agreement" provides that it is for "the sole benefit of the Seller Stockholders," which are defined as "Senior Golf, Senior Intermediate and Senior Social Members of the Club." As previously mentioned by the Court, the record reflects that not every owner of a residential lot in the Heatherwood subdivision at the time this Agreement was executed was a member of the Heatherwood Golf Club; therefore, this Agreement was not for the benefit of all Heatherwood homeowners. The foregoing language clearly indicates to this Court that this provision is a contract which is personal to HH. Therefore, this provision is not an express restrictive covenant which runs with the land.

*Merger*

HH and FCB contend that this provision was merged into the Deed HH received from

62

HGC because the Deed makes no reference to the terms of the Agreement; therefore, this provision is unenforceable against HH. "'Ordinarily, in the absence of fraud or mistake, when a contract to convey has been consummated by the execution of the delivery of the deed, the contract becomes *functus officio*, and the deed becomes the sole memorial and expositor of the agreement between the parties, and upon it the rights of the parties rest exclusively . . . .'" *Jones v. Dearman*, 508 So. 2d 707, 709 (Ala. 1987)(quoting *Alger-Sullivan Lumber Co. v. Union Trust Co.*, 207 Ala. 138, 142, 92 So. 254, 257 (1922)). "However, it is well settled that 'there are cases in which certain preliminary stipulations, such as are *independent and collateral* and not such preliminary agreement as would be merged in the conveyance, survive the deed and confer independent causes of action.'" *Starr v. Wilson*, 11 So. 3d 846, 855 (Ala. Civ. App. 2008)(holding that preemptive right of first refusal to purchase piece of property found in antecedent contract was independent and collateral and therefore did not merge into deed)(quoting *Ridley v. Moyer*, 230 Ala. 517, 520, 161 So. 526, 528 (1935)); *see also Brodgen v. Durkee*, 16 So. 3d 113 (Ala. Civ. App. 2009)(holding that time of performance clause of antecedent contract did not merge into deed); *Rickenbaugh v. Asbury*, 28 Ala. App. 375, 380, 185 So. 181, 184 (1938)(holding that contract of sale to provide seller with water for domestic purposes did not merge into executed, delivered, and accepted deed). This position is supported by a well-respected legal publication which addresses the issue of whether certain antecedent contractual provisions are merged into a deed which does not reference them as follows:

> The rule that prior expressions are merged into the deed is not as broad and absolute as some abbreviated statements of the doctrine might indicate. The doctrine of merger by deed is an application of the principle of integration in written contracts generally. The

63

crucial issue in determining whether there has been an integration is whether the parties intended their writing to serve as the exclusive embodiment of their agreement. Thus, by virtue of the principle of integration, the doctrine of merger does not apply to those provisions of the antecedent contract which the parties do not intend to be incorporated into the deed.

Where there are stipulations in the preliminary contract or contracts of which the conveyance is not a performance, the question of whether such stipulations are merged in the deed depends upon whether the parties intend a waiver, surrender, or other discharge of such stipulations, that is, upon whether the parties intend to accept the deed as full performance of the entire preliminary contract or contracts. The evidence of such intention may exist in or out of the deed. If plainly expressed in the terms of the deed, the evidence will be decisive, but if not so expressed, the question is open to other evidence.

77 Am. Jur. 2d *Vendor and Purchaser* § 244.

Although the Deed in this case does not in any way refer to the Agreement or the 25-year operation provision, the record in this case reflects that HH and HGC intended for both the Agreement and the Deed to be operative in their relationship with one another. This is evidenced by the negotiations between counsel for HH and HGC and the fact that HH and HGC recorded both the Deed and the "side agreement" to the Agreement, which outlined the general provisions of the Agreement, including the 25-year operation provision, simultaneously in the Probate Court of Shelby County, Alabama. The parties' intent is further evidenced by the fact that HH actually operated the golf course property as a golf course until it could no longer afford to do so. Had the parties not intended for this provision to be operative, HH would not have operated the golf course for roughly eight years. The Court also finds that this provision is, like the antecedent contractual provisions found in the Alabama cases cited above, independent and collateral in

64

nature. Based on the foregoing, the Court finds that the 25-year operation provision of the Agreement was not merged into the Deed.

Though this contractual provision was not merged into the Deed, the Court notes that it appears HH will not be able to comply with this provision. Assuming HH does not comply with this provision, HH will be in breach of this contract, which will allow HGC to seek contract damages from HH. However, the practical realities of this case indicate that HGC's ability to collect on any such damage claim is speculative.

V.      *Remaining Issues*

During the trial of this case, Mr. Ochsenhirt testified that HH spent over $2,500,000.00 on capital improvements to the Heatherwood Golf Club. This testimony was substantiated by invoices submitted by the contractors who made the various capital improvements to the Heatherwood Golf Club. Mr. Ochsenhirt's testimony was also supported by the testimony of Mr. Thompson, who testified that he believed HH spent at least $2,500,000.00 on capital improvements to the Heatherwood Golf Club. In view of this testimony and evidence, the Court finds that HH complied with its contractual obligation to make $2,500,000.00 in capital improvements to the Heatherwood Golf Club. Consequently, this Court finds that the reversion sought by HGC would be inappropriate.

The Court additionally notes that no evidence or testimony was offered to challenge FCB's claim that it is the holder of a first real estate mortgage on the golf course property. No testimony or evidence was offered in support of or challenging Mr. Kimmerling's second mortgage. Similarly, no other issues were raised by the testimony or evidence.

65

## CONCLUSION

Based on the foregoing, the Court finds that the golf course property at issue in this case is subject to an implied restrictive covenant which restricts the property to use as a golf course; therefore, the Court finds that the relief requested in the Debtor's Complaint To Sell Real Estate Free And Clear Of Liens, Interests And Encumbrances is due to be **DENIED**. The Court concludes as follows regarding any remaining claims in HGC's counterclaims and cross-claims: 1) HH complied with its contractual obligation to make $2,500,000.00 in capital contributions, so reversion is not appropriate and on this count of the counterclaim a judgment against HGC, the counterclaim Plaintiff, is due to be entered; and 2) on all remaining counts a judgment is to be entered against counterclaim and cross-claim Plaintiff and in favor of counterclaim and cross-claim Defendants.

A separate Order consistent with this memorandum opinion will be entered.

Dated: June 29, 2011.

/s/ Tamara O. Mitchell
United States Bankruptcy Judge

TOM: rdt

xc:     Charles Denaburg and Steve Altmann, attorneys for Heatherwood Holdings, LLC
        Lee Benton and Amy Hazelton, attorneys for HGC, Inc. and various Heatherwood homeowners
        James Bussian, Josh Baker, and Daniel Sparks, attorneys for First Commercial Bank

Case 09-00076-TOM11   Doc 273   Filed 06/29/11   Entered 06/29/11 13:29:26   Desc
Main Document     Page 66 of 67

67